**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |  |
|---|---|---|
| GERT JANNES KUIPER, | ) |  |
| Plaintiff, | ) | Case No. _____ |
| v. | ) |  |
| MARIO ADALBERTO REYES MENA, | ) |  |
| Defendant. | ) |  |
|  | ) |  |
|  | ) | JURY TRIAL REQUESTED |

## COMPLAINT

Plaintiff, Gert Jannes Kuiper in his personal capacity, alleges as follows:

### PRELIMINARY STATEMENT

1.      On March 17, 1982, four Dutch journalists and their guides headed to guerrilla-controlled territory in Chalatenango, El Salvador to report on the devastating human toll of the country's civil war. They were ambushed and killed en route by a Salvadoran military patrol. The patrol was stationed at the El Paraíso base of the Salvadoran Army, and under the command of Defendant Mario Adalberto Reyes Mena ("Reyes" or "Defendant"). This case arises out of the extrajudicial killing of the four journalists—producer and editor Jan Kuiper, reporter Koos Koster, cameraman Johannes "Joop" Willemsen and sound technician Hans ter Laag (the "Dutch Journalists")—and their guides.

2.      The patrol's killing of the Dutch Journalists took place against the backdrop of brutal human rights violations committed against civilians by the Salvadoran military and state

1

security forces (collectively, "Salvadoran Security Forces") during the civil war that engulfed El Salvador from 1980 until 1992.

3.    More than 75,000 civilians were killed during the conflict. The United Nations-appointed Commission on the Truth for El Salvador ("U.N. Truth Commission")—which was established as part of the 1992 peace agreement between the Salvadoran government and the Farabundo Martí National Liberation Front ("FMLN" for its name in Spanish)—concluded that 85 percent of these killings were carried out by Salvadoran Security Forces and their paramilitary allies.

4.    As part of its repression, the Salvadoran Security Forces regularly intimidated and targeted domestic and foreign journalists whose independent reporting they viewed as a threat. The killing of the Dutch Journalists, which the U.N. Truth Commission highlighted as among the most emblematic crimes committed during the civil war, demonstrated the brutality with which the Salvadoran Security Forces sought to stifle national and international independent media in El Salvador.

5.    In late February 1982, the Dutch Journalists arrived in El Salvador on assignment from Interkerkelijke Omroep Nederland ("IKON"), a Dutch television and radio broadcaster affiliated with the Protestant Church in the Netherlands. The team was led by Kuiper and Koster, who had worked together for years and had previously reported from El Salvador. Salvadoran Security Forces viewed their earlier reports—which included interviewing guerrilla members, documenting human rights abuses by state actors, and reporting on government-supported death squads—as pro-guerrilla, and thus as a threat.

6.    Salvadoran Security Forces surveilled and followed the Dutch Journalists upon their arrival in El Salvador. On March 11, 1982, Koster was arrested and, along with the other

three Dutch Journalists, brought to the headquarters of the Treasury Police—an intelligence agency known for its human rights violations and connections to death squads. The Dutch Journalists were questioned by the head of the Treasury Police about their potential connections to the FMLN.

7.    The next day, a newspaper allied with the Salvadoran Security Forces published a photograph of Koster and his colleagues as they walked through the Treasury Police headquarters' patio, on their way out of the compound. The accompanying article was headlined: "Foreign journalist a contact for subversives."

8.    The photograph circulated broadly in the domestic and international press. Plaintiff, who was then in Spain, read a news report that the Dutch Journalists had been questioned by the Treasury Police and was terrified by the implications for his brother's safety.

9.    On March 17, 1982, days after their questioning at the Treasury Police headquarters, the Dutch Journalists boarded a mini-bus in San Salvador marked with the word "PRENSA" ("Press" in Spanish) and headed for Chalatenango. The Dutch Journalists were accompanied by FMLN guides, including a 12-year-old boy. They had arranged to travel with the guides to areas controlled by the FMLN in order to document the lives of civilians living in those regions.

10.    Defendant was aware of the Dutch Journalists' plans. According to the U.N. Truth Commission's final report, on or around March 16, 1982, Defendant met with other military officers and agreed on a plan to ambush the Dutch Journalists on the basis of intelligence indicating that they would try to enter an area controlled by the FMLN the next day via a route near the El Paraíso military base under Defendant's command.

11.    On the day of the ambush, the Dutch Journalists were dropped off on the side of a road approximately four miles from the El Paraíso base. There, the Dutch Journalists were met by

two or three additional guides. The Dutch Journalists began their journey on foot through the countryside, carrying only their filming equipment. Minutes later, the patrol from the El Paraíso base, which had been lying in wait for the Dutch Journalists, began shooting. Two of the Dutch Journalists were immediately shot and felled. The other two attempted to flee but were soon hit by gunfire from the patrol. Within minutes, the patrol killed all four Dutch Journalists and all but one of their guides, who managed to escape.

12.    Plaintiff's brother, Jan Kuiper, was shot twice in the head.

13.    At the time of his death, Jan Kuiper was just days away from celebrating his fortieth birthday. Plaintiff had already planned a celebration for his older brother in Amsterdam. Instead, Plaintiff attended his funeral.

14.    Jan's death had a profound impact on his family, including on Plaintiff, who had grown increasingly close to Jan as Plaintiff entered adulthood. For years after Jan's killing, Plaintiff avoided the neighborhood in Amsterdam where Jan had lived because it was too painful to revisit spaces he associated with his brother. Jan's death made it difficult for Plaintiff to form full relationships with those around him for fear of also losing them. More than four decades later, Plaintiff still suffers from Jan's tragic murder.

15.    In the immediate aftermath of the killings, members of the Salvadoran Security Forces, including Defendant, denied that there was a planned ambush, falsely claiming that guerrillas had shot at the patrol and that the patrol had returned fire, accidentally killing the Dutch Journalists. No credible sources corroborated this account.

16.    Efforts at accountability for the killings were futile. The Salvadoran government and its Security Forces stifled any meaningful investigations, let alone prosecutions, of the killings.

17.     In 1992, the Salvadoran government and the FMLN reached a peace agreement, which included the creation of the U.N. Truth Commission to investigate crimes committed during the civil war. The U.N. Truth Commission issued its report and recommendations on March 15, 1993 ("U.N. Truth Commission Report").

18.     Based on its investigation, the U.N. Truth Commission concluded that soldiers acting under Defendant's command surveilled and then killed the Dutch Journalists in a premeditated ambush.

19.     On March 20, 1993, five days after the U.N. Truth Commission Report was made public, the Salvadoran government enacted a blanket amnesty law that shielded perpetrators—both guerrillas and members of the Salvadoran Security Forces, including Defendant—from investigations and prosecutions for human rights abuses ("Amnesty Law").

20.     The Amnesty Law prevented investigations or prosecutions involving civil war-era abuses for more than two decades until July 13, 2016, when the Constitutional Chambers of El Salvador's Supreme Court struck it down as unconstitutional.

21.     In December 2016, the Salvadoran Prosecutor General created the Unit for the Investigation of Crimes Committed during the Armed Conflict (the "Salvadoran Human Rights Unit"). Investigations into crimes committed during the civil war progressed slowly after the Salvadoran Human Rights Unit's establishment, yet Plaintiff maintained a renewed hope that accountability would be possible in El Salvador for his brother's killing.

22.     In November 2022, a Salvadoran court indicted three former officers of the Salvadoran Security Forces, including Defendant, for the killing of the Dutch Journalists.

23.     The other two former officers, the former Minister of Defense, José Guillermo García, and the former head of the Treasury Police, Francisco Antonio Morán, reside in El Salvador and were arrested following the indictments.

24.     Defendant, who now resides in the United States, has avoided arrest by ceasing all travel to El Salvador since the issuance of the 2022 indictment.

25.     In 2023, pursuant to a request by the judiciary in El Salvador, INTERPOL issued a Red Notice for Defendant's provisional arrest,[1] but no action has been taken on the Red Notice.

26.     Plaintiff's hope that the initiation of the criminal trial, along with the INTERPOL Red Notice, would result in Defendant facing justice in El Salvador for his brother's killing has been thwarted by Defendant's cessation of travel to the country of his birth. Nor is there any indication that extradition or removal to El Salvador will be prompt or even possible.

27.     Left with no viable legal recourse in El Salvador, Plaintiff commences this action against Defendant, a U.S. resident, for his responsibility and role in the extrajudicial killing of his brother, Jan Kuiper.

28.     This is an action for compensatory and punitive damages for torts in violation of the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note) ("TVPA").

29.     Congress enacted the TVPA to provide U.S. citizens and foreign nationals alike the ability to pursue civil remedies in U.S. courts for serious human rights abuses, such as extrajudicial killings, committed abroad where, as here, U.S. courts have personal jurisdiction over the

---

[1]     Red Notice, INTERPOL, https://www.interpol.int/en/How-we-work/Notices/Red-Notices/View-Red-Notices#2022-71798 (last visited October 8, 2024). "A Red Notice is a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action," and "it is based on an arrest warrant or court order issued by the judicial authorities in the requesting country." Red Notices, INTERPOL, https://www.interpol.int/en/How-we-work/Notices/Red-Notices (last visited October 8, 2024).

defendant. The TVPA's civil remedies were designed to contribute to an important goal: to ensure there is no "safe haven in the United States" for those who commit human rights abuses. S. Rep. No. 102-249, at 3 (1991).

## JURISDICTION AND VENUE

30.    This Court has jurisdiction over Plaintiff's claim of extrajudicial killing in accordance with 28 U.S.C. § 1331 because the action arises under a federal cause of action, the TVPA.

31.    The United States District Court for the Eastern District of Virginia is a proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and (c)(1) because Defendant resides in Centreville, Virginia, within this district.

## PARTIES

### *Plaintiff Gert Jannes Kuiper*

32.    Plaintiff Gert Jannes Kuiper is a Dutch citizen residing in the Netherlands.

33.    Plaintiff is the brother of the decedent Jan Kuiper and his closest living direct relative.

34.    Decedent Jan Kuiper was born on March 19, 1942 in the Netherlands and was a Dutch citizen.

35.    Jan Kuiper was known as a dedicated and skilled journalist with a commitment to covering social justice issues, both in the Netherlands and internationally. He began his career as a reporter shortly after his high school graduation, when he began to write stories for his local newspaper. Over the course of his 15-year career in journalism, Jan Kuiper worked for news outlets in the Netherlands and Germany. He began his work at IKON, a Dutch television and radio broadcaster affiliated with the Protestant Church in the Netherlands, in 1976.

36.     Jan Kuiper had extensive experience in Latin America and had traveled to El Salvador on two prior occasions as a reporter and freelancer for IKON. There, he interviewed Marianella García Villas, a well-known Salvadoran politician and human rights activist who was tortured and assassinated by Salvadoran Security Forces in 1983. Jan Kuiper had also reported on human rights abuses in Mexico and in Chile in the years following the military coup by Augusto Pinochet.

### Defendant Mario Adalberto Reyes Mena

37.     From 1957 to at least 1986, Defendant Reyes was a member of the Armed Forces of El Salvador.

38.     In March 1982, Defendant was a colonel and the commander of the Fourth Infantry Brigade of the Salvadoran Army (the "Fourth Brigade"), headquartered in El Paraíso, in the Chalatenango department of El Salvador. The Dutch Journalists were killed by a patrol stationed at the El Paraíso base and acting under Defendant's command.

39.     In 1984, Defendant relocated to the United States as a military attaché for the Salvadoran government based in Washington, D.C.

40.     Defendant settled in the United States and currently resides in Centreville, Virginia.

41.     Following his relocation to the United States, Defendant continued to return to El Salvador up until the November 2022 indictment issued against him by Salvadoran authorities.

### STATEMENT OF FACTS

42.     Plaintiff Gert Kuiper, by and through his attorneys, alleges upon knowledge as to himself and his own actions and upon information and belief as to all other matters, as follows:

I.   **State Violence Against Civilians and Targeting of Independent Media during the Armed Conflict in El Salvador**

43.     From 1980 to 1992, El Salvador was ravaged by a civil war between the Salvadoran government and the FMLN.

44.     In 1992, the Salvadoran government and the FMLN reached a peace agreement. As part of the peace accord, a United Nations-led truth commission was established to investigate the crimes of both sides of the conflict. The U.N. Truth Commission's investigation focused on "serious acts of violence" committed during the civil war, including extrajudicial killings, enforced disappearances, and torture.

45.     In its Report, the U.N. Truth Commission concluded that more than 75,000 civilians were killed and another 8,000 were forcibly disappeared, with the vast majority of these crimes committed by Salvadoran Security Forces and their paramilitary allies.

46.     The U.N. Truth Commission found that Salvadoran Security Forces and their paramilitary allies engaged with impunity in campaigns against civilians, murdering politicians, teachers, union leaders, university students, human rights activists, priests, nuns, journalists, and other notable figures in Salvadoran society. State institutions actively collaborated in or turned a blind eye to these killings.

47.     The Salvadoran Security Forces considered independent media members and their public reporting as a threat.

48.     At the time, independent media coverage of the Salvadoran Security Forces' gross human rights abuses imperiled the support the Salvadoran government received from allied governments.

49.     In the fall of 1981, for example, the U.S. Congress enacted a law requiring that before providing U.S. aid to El Salvador, the President of the United States certify that the

Salvadoran government was adhering to a series of conditions, including complying with human rights standards, controlling the excesses of its military, and investigating the 1980 rape and murder of four American churchwomen in El Salvador.

50.     Independent media coverage of the Salvadoran Security Forces' human rights abuses also helped to fuel public protests and activism internationally, including in the United States, that were critical of the Salvadoran government.

51.     The Salvadoran Security Forces systematically targeted Salvadoran journalists and news outlets that did not report favorably on the government. Independent media outlets were bombed. Editors and journalists were threatened, attacked, killed, or disappeared until the outlets closed.

52.     For example, the publisher of *El Independiente*, the last independent newspaper in El Salvador, stated that he fled the country "not because of lack of the Salvadoran people's support for idealistic journalism, but because, after the takeover of my office and machinery, after the capture of my employees and perhaps even the eventual disappearance of my family and myself, there would be absolute silence about the facts."

53.     Foreign journalists did not fare much better. The Salvadoran Security Forces viewed foreign journalists, in particular, as siding with the FMLN. According to the Committee to Protect Journalists, in the two years that preceded the Dutch Journalists' killings, 26 journalists—foreign and Salvadoran—had been killed.

54.     In 1980, an American freelance journalist was forcibly disappeared. His mutilated remains were found in 1983, only after his family's congressional representative managed to make the investigation of the journalist's death part of the certification requirements for U.S. aid to El Salvador.

55.     In early March 1982, a Salvadoran Security Forces-affiliated death squad circulated a list of twenty-four names, including fourteen American journalists and a United States Embassy public affairs officer, calling for "death to traitors of Democracy."  The death squad called them "pseudo-journalists in the service of international subversion who have been condemned to death by the patriots."

56.     The situation grew particularly acute in the lead-up to the March 28, 1982 Constitutional Assembly elections, when hundreds of foreign journalists came to El Salvador to cover the national elections. In the prior month, controversy over the U.S. administration's certification of El Salvador's human rights record and efforts to investigate the forced disappearance of the American freelance journalist, and the rape and murder of four American nuns who were ministering in El Salvador, had resulted in negative press coverage of the Salvadoran government and its Security Forces.

57.     With such an extensive contingent of foreign journalists present in the country in the early months of 1982, it became increasingly important for the Security Forces to crack down on independent reporting from El Salvador that might further tarnish the government's image internationally.

58.     It was in this heightened climate of repression and threats against independent media that the Dutch Journalists arrived in El Salvador.

## II.     The Salvadoran Security Forces Perceived the Dutch Journalists and their Reporting as a Threat

59.     In February 1982, the Dutch Journalists traveled to El Salvador on assignment for IKON to report on the devastating human toll of the country's civil war, including planned reports from San Salvador, El Salvador's capital, and from FMLN-controlled areas.

60.     Both Kuiper and Koster had previously traveled to El Salvador and published stories critical of the Salvadoran Security Forces.

61.     In 1980, Koster and Kuiper's team produced a documentary on Salvadoran civil defense units and Salvadoran Security Forces-aligned death squads that garnered international attention.

62.     That same year, Koster had interviewed Archbishop Óscar Romero, a leading figure for peace in El Salvador. Shortly after, in March 1980, the Archbishop delivered a sermon over the national radio pleading with the Salvadoran Security Forces to stop the killing and repression of the Salvadoran people. The next day, the Archbishop was assassinated under orders of high-ranking officials from the Salvadoran Security Forces.

63.     On February 24, 1982, the Dutch Journalists arrived in San Salvador from Mexico City and checked in at the Hotel Alameda.

64.     According to a de-classified U.S. diplomatic cable, at the time of the Dutch Journalists' arrival in San Salvador, "it was generally known that the four were making a 16mm film sympathetic to the guerrillas, similar to one they made in 1980."

65.     On or about March 7, 1982, the Dutch Journalists visited Mariona Prison in San Salvador, where political prisoners, principally union leaders, were held. They interviewed political prisoners who were part of the leadership inside the detention center, and documented scars and other physical evidence of torture on the bodies of detainees. The Dutch Journalists sent the footage of the interviews from Mariona Prison back to the Netherlands.

66.     On March 10, 1982, Hotel Alameda staff informed the Dutch Journalists that members of the notorious Treasury Police had been looking for them at the hotel.

67.     As detailed by the U.N. Truth Commission, the Treasury Police was an intelligence unit that worked with death squads and was responsible for numerous assassinations, massacres, enforced disappearances, and acts of torture during the civil war. At the height of its power, the Treasury Police consisted of over 2,000 members and was headed by Col. Francisco Antonio Morán.

68.     On the morning of March 11, 1982, about twenty members of the Treasury Police arrived at the Hotel Alameda and arrested Koster for his supposed links to the FMLN. The rest of the Dutch Journalists decided to accompany him to Treasury Police headquarters as a show of solidarity.

69.     At the Treasury Police headquarters, the Dutch Journalists were questioned by the head of the Treasury Police, Col. Morán, who claimed that Koster's contact information was found among the possessions of a captured FMLN member.

70.     The Association of Foreign Correspondents (*Asociación de corresponsales extranjeros*) quickly learned that the Dutch Journalists were being questioned at the Treasury Police headquarters and mobilized to spread news of Koster's arrest.

71.     As detailed in de-classified U.S. diplomatic cables, the United States and Dutch Embassies also engaged with the Salvadoran government to secure Koster's release.

72.     After four hours of questioning, Col. Morán released Koster and his colleagues, once Koster signed a document stating he was not mistreated.

73.     When the Dutch Journalists returned to the Hotel Alameda, they observed that their hotel rooms had been searched while they were detained, though nothing appeared to be missing.

74.    Jan Schmeitz, a freelance journalist from the Netherlands who was staying at the same hotel, advised the Dutch Journalists to take their detention by the Treasury Police seriously and to be extremely careful while in El Salvador.

75.    The next day, March 12, 1982, a newspaper aligned with the Salvadoran Security Forces published a photo of Koster and his colleagues—including Jan Kuiper on the far left (see below)—showing them as they walked through the Treasury Police headquarters' patio, on their way out of the compound. The accompanying article, which largely copied a press release issued by the Salvadoran Armed Forces Press Committee, was headlined: "Foreign journalist a contact for subversives."



76.    Foreign and Salvadoran journalists warned the Dutch Journalists that being the focus of a Treasury Police investigation was dangerous and attempted to dissuade them from

continuing their reporting. Some advised them to leave the country immediately given the risks to their safety.

77.    The Dutch Journalists decided to press on with their independent reporting.

78.    On or about March 15, 1982, the Dutch Journalists finalized their plan to travel from San Salvador to an FMLN-controlled zone in the department of Chalatenango to document the lives of civilians in those areas. On March 16, 1982, Koster borrowed a mini-bus marked with the word "PRENSA" ("Press") from Schmeitz for the planned trip.

**III.    Soldiers Under Defendant's Command Ambushed and Killed the Dutch Journalists**

**A.    Salvadoran Soldiers Stationed at the El Paraíso Base in March 1982 Operated Under Defendant's Command**

79.    Salvadoran Security Forces and the FMLN both controlled portions of the department of Chalatenango. Salvadoran Security Forces controlled the area immediately around El Paraíso, whereas the surrounding areas were disputed between the government and the FMLN. The location of the ambush, about 4 miles east of El Paraíso, was not considered safe for Salvadoran Security Forces.



80.     The Fourth Brigade of the Salvadoran Army was the military unit responsible for Chalatenango and was headquartered at a base in El Paraíso. At the time, units at the El Paraíso base had a designated patrol area near the base given the presence of FMLN forces nearby and the disputed control of the surrounding areas.

81.     In March 1982, Defendant, a colonel in the Salvadoran Army, was the commander of the Fourth Brigade.

82.     In March 1982, Defendant had command over all Salvadoran soldiers stationed at the El Paraíso base, including members of the Fourth Brigade and members of the Atonal Battalion.

83.     In March 1982, members of the Atonal Battalion were stationed at the El Paraíso base while receiving training from American military advisors present at the base.

84.     The Atonal Battalion, still completing its training in early 1982, was one of three Rapid Deployment Infantry Battalions ("BIRI," for its name in Spanish). BIRI were highly trained specialized anti-guerrilla combat units.

85.     Defendant was aware of the Dutch Journalists' plans to travel to Chalatenango on March 17, 1982 to access FMLN-controlled areas. According to the U.N. Truth Commission Report, on or around March 16, 1982, "a meeting was held in which officers of the General Staff of the Fourth Brigade, including its Commander, [Defendant] Colonel Mario A. Reyes Mena, and officers of the Atonal Rapid Deployment Infantry Battalion (BIRI) took part. According to those interviewed, the ambush was planned at that meeting, on the basis of precise intelligence data indicating that the journalists would try to enter the zone controlled by the FMLN via that route the next day."

**B.    The Ambush and Killing of the Dutch Journalists**

86.    On the morning of March 17, 1982, a patrol of soldiers stationed at the El Paraíso base and acting under Defendant's command departed the base to ambush the Dutch Journalists near Santa Rita.

87.    Defendant was present at the El Paraíso base as the patrol departed and when it returned. It was a usual practice for patrols to be in regular radio communication with the base while in the field.

88.    The patrol set up atop two hills overlooking a hollow. The Dutch Journalists were expected to pass through the hollow on their way to FMLN-controlled territory.

89.    Once in position, the patrol waited for the Dutch Journalists to arrive.

90.    The same day, a German journalist, Armin Friedrich Wertz, drove the Dutch Journalists in their borrowed mini-bus marked "PRENSA" to the meeting point in the municipality of Santa Rita, department of Chalatenango, picking up FMLN guides in San Salvador, including a 12-year-old boy.

91.    On the way, Wertz observed that they were being followed by a Cherokee jeep, a vehicle often used by the Salvadoran Armed Forces. The jeep turned off the road just before their last turn to the meeting point.

92.    The meeting point was near the San Salvador-Chalatenango Road, near the turn-off for Santa Rita. The drop-off point was approximately four miles from the El Paraíso base.

93.    At around 5 p.m., the Dutch Journalists stopped on the side of a road. There, they were met by additional guides.

94.     Wertz agreed that he would return to collect the Dutch Journalists on March 21. Thereafter, the Dutch Journalists, all of whom were unarmed, and their guides set off on a path leading to a hollow opposite a hill, walking in single file with the journalists in the middle.

95.     When they reached the hollow—about 250 meters along the path—the group suddenly came under heavy fire from the patrol, deployed on the two hills overlooking the hollow.

96.     The patrol killed all four of the Dutch Journalists.

97.     Two of the Dutch Journalists were immediately struck by the gunfire and fell to the ground. The two other journalists attempted to escape by running towards a nearby riverbed but were shot and killed by members of the patrol.

98.     Jan Kuiper was injured by shrapnel and shot twice in the head.

99.     The patrol killed all but one of the FMLN guides. That sole survivor, Martín, later testified before the Dutch Parliament in May 1982.

100.    In his testimony, Martín described hearing the sound of gunshots coming from two separate directions, and dropping to the ground, rolling, and attempting to cover himself in response. He looked back and saw two of the Dutch Journalists, one in a white shirt and one in a red shirt, lying on the ground and no longer moving.

101.    Once the attack was over, the patrol radioed the El Paraíso base to report back. Defendant dispatched a vehicle to collect the patrol and return them to their base. Upon their return, the patrol celebrated their success and referred to their mission as an "ambush."

C.     **Aftermath of the Ambush and Killing of the Dutch Journalists**

1.     *The Salvadoran Government and its Security Forces Tried to Cover Up the Truth About the Ambush and the Killing of the Dutch Journalists*

102.    The Salvadoran government and its Security Forces worked to promote a false narrative regarding the ambush, namely that the patrol was already in the area, waiting for a truck

18

to pick them up by the side of the main road, after spending the day investigating FMLN activity. Salvadoran Security Forces claimed that, as the patrol was waiting for their transport, the soldiers were fired upon by a group of guerrillas. According to this false narrative, a firefight began, and the Dutch Journalists were mistaken for guerrillas and killed in the crossfire.

103.    Consistent with the false narrative, Defendant failed to discipline his subordinates for the killings, refused to admit that the targeted ambush was intentional, and refused to admit his role in its planning.

104.    In the days following the killings, Salvadoran Security Forces sought to intimidate individuals connected to the Dutch Journalists.

105.    In the early morning of March 18, 1982, Treasury Police agents went to Mariona Prison, where the Dutch Journalists had conducted interviews days earlier. The agents ordered all the political prisoners to lay on the floor face down and proceeded to read aloud the names of roughly ten prisoners: the leadership team who had met with the Dutch Journalists. Those whose names were called were then singled out for severe beatings and torture over the next several hours. One prisoner was so severely beaten that his back was permanently injured.

106.    As they were being assaulted, the prisoners were told by a member of the Treasury Police: "we've just killed some Dutch journalist guerrillas and you are going to get the same when you leave." Another of the political prisoners overheard a conversation between two soldiers about the killing of the Dutch Journalists.

107.    Two days after the Dutch Journalists' murders, Schmeitz, their fellow Dutch journalist friend and colleague, received threatening phone calls, demanding that he stop looking into the deaths of his colleagues and stating that there was "a fifth coffin" waiting for him.

Schmeitz also encountered people at the Hotel Alameda, where he had been staying with the Dutch Journalists, who made the same statement to him. He changed hotels that night.

108.    Schmeitz was convinced he was in serious danger after speaking to the Dutch Ambassador, who informed him that El Salvador's President had said that he could not guarantee Schmeitz's safety. Soon after hearing this, Schmeitz received a call from the press officer of the U.S. Embassy, offering an armored vehicle to take him to the airport.

109.    Alarmed that the U.S. Embassy thought him, a Dutch citizen, sufficiently at risk to offer a protected vehicle and assistance in evacuating from El Salvador, Schmeitz quickly packed and left for the airport in the U.S.-provided transport.

2.    *Facts Uncovered by Investigations, Including a Contemporaneous Investigation by U.S. Officials, Belied the False Narrative Advanced by the Salvadoran Government and its Security Forces*

110.    Despite the Salvadoran government and its Security Forces' attempt to cover up the truth, the facts on the ground belied their false narrative.

111.    On March 18 at or around 2:30 a.m., Col. John McKay, then-Assistant Defense Attaché at the U.S. Embassy in San Salvador, received a phone call telling him that foreigners had been killed and their bodies were at the El Paraíso base.

112.    Col. McKay got a helicopter transport from Salvadoran forces stationed at the Central Headquarters ("Cuartel General") in San Salvador.

113.    At the time, Salvadoran forces had UH-1H helicopters, which could be flown at night. Salvadoran pilots carried out night-time operations and had been trained to do so.

114.    Col. McKay arrived at the El Paraíso base around 4 a.m. on March 18. When U.S. military officers visited Salvadoran military facilities, the usual practice was for the commanding officer to meet with the U.S. representative. When he asked to meet with Defendant, the

commander of the Fourth Brigade, he was told that Defendant was unavailable. Defendant's unavailability was contrary to regular practice.

115.    Col. McKay examined the bodies of the Dutch Journalists. Col. McKay saw gunpowder residue on two of the bodies: one was wounded twice in the upper chest, and the other one had a head wound near the bridge of the nose. He turned the head of one of the deceased journalists and saw an exit wound at the back of the head. Based on his prior combat experience, Col. McKay concluded from the wounds that these two Dutch Journalists had been shot from a close range.

116.    Col. McKay returned to San Salvador via helicopter and went directly to the U.S. Ambassador's residence, where he informed him in person of the killings.

117.    The U.S. Government immediately sent its embassy officials to investigate the killings.

118.    Later that same morning, only a few hours after his first visit, Col. McKay returned to El Paraíso to continue his investigation of the killings. At least one additional U.S. government official, a U.S. Embassy political officer, was also present.

119.    The U.S. Embassy in San Salvador sent a (now declassified) cable to the State Department following the second on-site investigation into the killings.

120.    According to the cable, the U.S. investigators examined the bodies of the four Dutch Journalists at the El Paraíso base and concluded that all died from multiple gunshot wounds. The powder burns indicated that the Dutch Journalists were killed at a distance expected to be no greater than 75 meters.

121.    As noted in the cable, U.S. military advisors who were on-site at El Paraíso on March 17 and 18, 1982 reported to the U.S investigators that the Salvadoran soldiers returning

from their mission at around 8 p.m. on the night of March 17 "expressed elation at their success and referred to their mission as an 'ambush.'" One U.S. military advisor noted that the patrol was about three kilometers beyond the normal patrol perimeter, in a solidly guerrilla area, and observed that it was not common for patrols to be out after dark.[2]

122.    The U.S. investigators, including Col. McKay, then headed to the site of the killing, accompanied by Salvadoran soldiers who claimed to have been part of the patrol.

123.    The cable noted that the soldiers offered a "nearly uniform version of the patrol and firefight," which differed from the "information gathered at the site of the encounter."

124.    The soldiers showed the U.S. investigators the spots from which they claimed to have fired and maintained that they did not advance from their original shooting positions. While the U.S. investigators found shell casings in the original locations indicated by the soldiers, they also found "numerous" shell casings in other locations, indicating that the soldiers had advanced toward the Dutch Journalists while firing. A sergeant who led the patrol also acknowledged to the U.S. investigators that he killed two of the journalists at a range of approximately 25 meters as they tried to escape toward a small riverbed.

125.    The cable noted that the U.S. investigators recovered numerous M-60 shell casings from the site of the killing.

126.    M-60s are typically used as crew-serviced weapons and operated by at least two individuals. Their weight and use make them impractical for routine foot patrols; they are better suited for carrying out attacks from stationary positions.

---

[2] On March 17, 1982, sunset in El Salvador was at 6:02 p.m.

127.    The Salvadoran soldiers also claimed to have taken "heavy fire," including grenade fire, from about 20 to 35 guerrillas and showed the hilltops from which they claimed guerrillas had fired. The U.S. investigators examined these locations and found "no extensive evidence of guerrilla fire," including no evidence of any grenade fire in those areas and no evidence that the ground had been disturbed. The cable noted that the soldiers attempted to explain the discrepancy by "insist[ing] that the guerrillas had picked up all of their shells before leaving, even though it was almost dark."

128.    Based on his investigation at the site of the killing and his extensive combat experience, Col. McKay concluded that the patrol was set up in a tactical position atop two hills overlooking the path below where the Dutch Journalists had planned to pass, creating a "kill zone" that bore the hallmarks of a classic ambush.

129.    Later, the Dutch government carried out its own investigation into the killing of the Dutch Journalists despite a lack of cooperation from the Salvadoran government. When the Dutch Ambassador requested to interview the sergeant and soldiers who carried out the ambush in the days following the killings, for example, the Salvadoran government refused to provide authorization. The Dutch investigative team visited the site of the killings as well as El Paraíso, accompanied by Col. McKay. Based on the evidence the Dutch mission could gather, the Dutch government similarly concluded that the Salvadoran government and its Security Forces' account of the death of the Dutch Journalists was "unbelievable and contestable."

130.    Following the end of the civil war in 1992, the U.N. Truth Commission was tasked with conducting investigations into serious acts of violence committed during the civil war by both sides. In its final report, issued on March 15, 1993, the U.N. Truth Commission highlighted the

killing of the Dutch Journalists as among the most emblematic crimes committed by state actors during the conflict.

131.   Not all emblematic cases discussed by the U.N. Truth Commission name a perpetrator. To identify specific perpetrators, the U.N. Truth Commission's methodology required "overwhelming evidence" linking the perpetrator to that atrocity, including confirmation of the relevant event and perpetrator by multiple credible sources, and gave the alleged perpetrator the opportunity to provide his version of events.

132.   After its investigation into the Dutch Journalists' killings, which included interviews with numerous witnesses, the U.N. Truth Commission concluded that "the ambush was set up deliberately to surprise and kill the journalists and their escort; that the decision to ambush them was taken by Colonel Mario A. Reyes Mena, Commander of the Fourth Brigade, with the knowledge of other officers; that no major skirmish preceded or coincided with the shoot-out in which the journalists were killed; and, lastly, that [Defendant] and other soldiers concealed the truth and obstructed the judicial investigation."

   3.   *Following the Killing of the Dutch Journalists, Salvadoran Security Forces Successfully Repressed Independent Media Coverage During the Remainder of the Civil War*

133.   For the foreign journalists remaining in El Salvador, the killing of the Dutch Journalists, along with the subsequent cover-up and broader campaign of intimidation, sent a clear message: stop covering the guerrillas.

134.   A few weeks after the killing of the Dutch Journalists, on the day of the Constitutional Assembly elections, a banner hanging in front of a hotel frequented by foreign journalists threatened, "Don't lie, foreign press."

135.   The Salvadoran Security Forces' campaign to suppress independent reporting around the upcoming elections bore fruit. For example, in the months that followed the Dutch

Journalists' killings, the percentage of television reports from El Salvador devoted to the FMLN dropped from 30 percent to under 5 percent.

136.    While the Dutch Journalists' murder was among the most brazen attacks on foreign journalists by the Salvadoran Security Forces, it was not the last or only one. The Salvadoran Security Forces' targeting of Salvadoran and foreign journalists continued throughout the civil war.

137.    On March 27, 1983, the Treasury Police detained two American journalists for questioning about being in contact with guerrillas. The journalists were able to contact the U.S. Embassy while being questioned at their apartment and were accompanied by consular officials to the Treasury Police. The journalists were ultimately released after U.S. Embassy intervention.

138.    Salvadoran Security Forces shot at three U.S. journalists in July 1985 while they were crossing a river on foot. The shooting continued even after they identified themselves as members of the press in Spanish. The Salvadoran Security Forces dismissed the attack by claiming the army mistook them for "gringo terrorists," and the colonel in command of the forces that shot at the journalists stated, in his incident report, that he believed "the journalists planned to have a meeting with terrorists."

139.    On March 18 and 19, 1989, the eve and the day of presidential elections, the army was involved in the unprovoked shooting of three journalists, killing two of them. In addition, on March 19, 1989, a Dutch cameraman was gravely injured in crossfire and rushed to the hospital in a press vehicle. While en route to the hospital, the press vehicle was attacked by a Salvadoran air force plane and helicopter, which fired rockets and forced it off the road, delaying the wounded cameraman's arrival to the hospital.

140.    All told, the Committee to Protect Journalists reported that at least three dozen journalists were killed during the civil war. Salvadoran authorities did not conduct effective investigations, much less prosecute or convict any of the perpetrators, for any of these attacks.

4.    *Decades of Obstacles to Accountability and Extraordinary Circumstances Prevented Plaintiff from Filing this Suit Until Now*

141.    In the immediate aftermath of the killing of the Dutch Journalists, the families of the Dutch Journalists, including Plaintiff, could not learn the truth of what took place, how their family members died, or who was responsible for their deaths.

142.    The Salvadoran government and its Security Forces' cover-up and false narrative about how the killings took place and their threats to witnesses and journalists who sought to shed light on the incident obstructed public knowledge about the killings, including Plaintiff's knowledge.

143.    Although criminal proceedings in the Court of First Instance at El Dulce Nombre de María were initiated following the killing of the Dutch Journalists (the "Initial Criminal Proceedings"), they quickly hit a roadblock when the military refused to make any relevant military personnel available to the investigative judge, Dora del Carmen Gómez de Claros, for questioning. Under the Salvadoran criminal procedure in force at the time, investigations were led by investigative judges.

144.    In 1988, after Judge Claros was forced to flee El Salvador following death threats for her work in this case, the Initial Criminal Proceedings were terminated without any additional information being released to the Dutch Journalists' families.

145.    In 1992, with the end of the civil war and the creation of the U.N. Truth Commission, there appeared, for the first time, a potential opportunity to properly investigate the killings of the Dutch Journalists. In its final report, issued on March 15, 1993, the U.N. Truth

Commission found that the Salvadoran government failed to meet its obligation to investigate, bring to trial, and punish guilty parties, as required under international law. The U.N. Truth Commission also stated that the then-President of the Supreme Court of El Salvador "failed to cooperate" with the U.N. Truth Commission's investigation.

146.    On March 20, 1993, days after the U.N. Truth Commission's Report became public, the Salvadoran government enacted the Amnesty Law. The Amnesty Law shielded Salvadoran Security Forces and FMLN forces from prosecution for human rights abuses committed during the civil war and protected offenders from civil liability. It made domestic investigations and prosecutions for crimes committed in the context of the armed conflict impossible.

147.    Even with the protection of the Amnesty Law, Salvadoran Security Forces continued to block access to key evidence, such as documents, military and security forces personnel information and interviews, related to its involvement in human rights abuses during the civil war, including targeted killings carried out by the Security Forces.

148.    In 2012, the Inter-American Court of Human Rights issued a binding judgment on El Salvador in the case of *El Mozote v. El Salvador*, holding that the provisions of the Amnesty Law that had thus far prevented the investigation, prosecution and, where appropriate, punishment for those responsible for crimes against humanity perpetrated during the civil war resulted in impunity, violated international law, and were incompatible with the American Convention on Human Rights, to which El Salvador is a party.

149.    Notwithstanding this judgment, the Amnesty Law remained in effect until 2016, when the Salvadoran Supreme Court, relying on Inter-American jurisprudence and other international humanitarian law and human rights instruments, declared unconstitutional all the articles of the Amnesty Law that prevented the investigation of crimes against humanity and war

crimes committed during the civil war. The Supreme Court held the Amnesty Law to be invalid as to all the cases described in the U.N. Truth Commission, including the killing of the Dutch Journalists.

150.    Following this ruling, in December 2016, the Salvadoran Prosecutor General created the Salvadoran Human Rights Unit to investigate crimes committed during the civil war.

151.    Despite the Supreme Court's ruling, the Salvadoran Security Forces continued to block access to evidence and to obstruct any investigations into its abuses during the civil war, even in the face of court orders. For example, in the investigation into the December 1981 killing of more than one thousand villagers in the El Mozote Massacre, the Salvadoran military refused to provide access to its archives, despite a court order to do so.

152.    In March 2018, Plaintiff filed a criminal complaint with the Salvadoran Attorney General's Office requesting an investigation of the Dutch Journalists' murders. In response, the Prosecutor's Office began prosecuting the case, and sent the file to a court in Dulce Nombre de María, the Chalatenango municipality where the case was first opened in 1982.

153.    Two Salvadoran human rights organizations, one of which is Plaintiff's legal representative, conducted their own investigation and developed additional evidence.

154.    Plaintiff learned of Defendant's location and presence in Centreville, Virginia in September 2018, when a Dutch television program aired a documentary on the killings that tracked Defendant to his current residence.

155.    On July 16, 2021, Plaintiff, who has standing to be appointed a civil party in the criminal investigation of his brother's murder under Salvadoran law, filed a renewed criminal complaint naming Defendant and two other former officers as responsible for the extrajudicial

killing of Plaintiff's brother, Jan Kuiper. On September 22, 2022, Plaintiff asked the court to order Defendant's arrest. Two weeks later, the Attorney General's Office made the same request.

156.    Under the Salvadoran legal system, civil remedies are available to civil parties after the conclusion of the criminal proceedings.

157.    Because the criminal investigation was initially opened in 1982, it proceeds under the former criminal procedural code, in which a presiding judge leads the investigation as investigative judge.

158.    In November 2022, the court issued an order indicting three former high-ranking officers for the killing of the Dutch Journalists, including Defendant.

159.    Two of these former officers, Gen. José Guillermo García and Col. Francisco Antonio Morán, reside in El Salvador and were arrested following the issuance of the indictments.

160.    Following the indictment, Defendant, who resides in the United States, has avoided arrest in El Salvador by no longer returning to El Salvador. Before his indictment, Defendant regularly traveled to El Salvador.

161.    In 2023, pursuant to a request by the judiciary in El Salvador, INTERPOL issued a Red Notice for Defendant's provisional arrest,[3] but no action has yet been taken on the Red Notice.

162.    Further, no information suggests that extradition or deportation will be prompt or even possible, despite a Salvadoran court order to the Salvadoran executive branch to seek Defendant's extradition.

163.    With no viable legal recourse left for Plaintiff against Defendant in El Salvador, Plaintiff brings the present action in the United States District Court for the Eastern District of

---

[3] *Supra* note 1.

Virginia, where Defendant resides, for his responsibility in the killing of Plaintiff's brother, Jan Kuiper.

## GENERAL ALLEGATIONS

164.    In March 1982, Defendant was a colonel in the Salvadoran Army. At the time, he served as commander of the Fourth Brigade.

165.    The acts described herein were inflicted under color of foreign law of the government of El Salvador and were inflicted deliberately and intentionally.

166.    Defendant exercised command responsibility over, conspired with, or aided and abetted subordinates in the Salvadoran military to commit acts of extrajudicial killing.

167.    At all times relevant to the extrajudicial killing, Defendant was in command of all the soldiers stationed at El Paraíso base, including members of the Fourth Brigade and the Atonal Battalion. As a commanding officer, Defendant had the legal authority and practical ability to exert control over his subordinates, including those who participated in the ambush and killing of the Dutch Journalists.

168.    As commanding officer, Defendant knew, or should have known, that the patrol that left the El Paraíso base on March 17, 1982 was on a mission to ambush and kill the Dutch Journalists.

169.    Defendant knew, or should have known, that soldiers under his command extrajudicially killed the Dutch Journalists, including Jan Kuiper.

170.    As commanding officer, Defendant was under a duty to investigate, prevent, and punish violations of international and Salvadoran law committed by soldiers under his command. Defendant's command included the authority and responsibility to give orders to, and to appoint, remove, and discipline soldiers stationed at the El Paraíso base.

171.    Defendant failed or refused to take all reasonable and necessary measures to prevent the ambush and killing of the Dutch Journalists, or to investigate or punish soldiers under his command for committing such abuses. To the contrary, he encouraged, ordered, and sought to cover up the extrajudicial killing of the Dutch Journalists.

172.    Defendant also conspired with the soldiers under his command and other officers in the Salvadoran military to plan and carry out the ambush, and then to cover up these actions. Defendant conspired and acted in concert with one or more members of the Salvadoran military pursuant to a common plan, design, and scheme to ambush and kill the Dutch Journalists, as a result of which Jan Kuiper was subjected to the violations described herein.

173.    Defendant knowingly joined and participated in carrying out the common plan, design, and scheme. In addition to being personally liable for his own actions, Defendant is jointly and severally liable for the actions of his co-conspirators, all of which were actions undertaken in furtherance of a common plan, design, and scheme to commit the ambush and killings.

174.    Defendant is also responsible by virtue of having aided and abetted, or otherwise substantially assisted in the ambush and killing of the Dutch Journalists, including Jan Kuiper, and then by covering up the crimes and obstructing an effective investigation into the murders. Defendant participated in the planning of the killings, and falsely claimed the killings were accidental and occurred in an unexpected firefight between the patrol and the FMLN to ensure he and the other officers were not held responsible for the crimes.

175.    At all relevant times, Defendant purposefully intended that his actions would aid, abet, or assist in the commission and cover-up of the killings. Defendant is therefore jointly and severally liable for the wrongful conduct of the persons he aided and abetted.

176.    The killing of Jan Kuiper inflicted severe mental pain and suffering on his family members, including Plaintiff.

177.    The killing of the Dutch Journalists exemplified the brutality with which the Salvadoran Security Forces sought to repress any independent reporting that might shed light on its own human rights abuses or be perceived as sympathetic to the FMLN. The Salvadoran Security Forces' campaign of repression against independent journalism and the Defendant's vital role in killing the Dutch Journalists not only ended the Dutch Journalists' reporting from El Salvador but also stifled the work of other journalists who sought to cover the civil war and its devastating impact on civilians.

## CLAIM FOR RELIEF

### *Extrajudicial Killing of Jan Kuiper in Violation of the Torture Victim Protection Act*

178.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

179.    Defendant's conduct constitutes extrajudicial killing as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

180.    On March 17, 1982, a patrol of soldiers stationed at the El Paraíso base and acting under the command of Defendant prepared an ambush for the Dutch Journalists and their guides. Later that day, the Dutch Journalists and their guides arrived in Chalatenango and set out on foot along a path into guerrilla-controlled territory. As the path descended between two hills, the patrol opened fire on the group without provocation.

181.    Jan Kuiper died from the gunshot wounds sustained during the ambush.

182.    No regularly constituted court authorized the killing of Jan Kuiper. Jan Kuiper was never sentenced to death for any crime.

183.    Defendant and his fellow perpetrators acted under actual or apparent authority, or under color of law, of the government of El Salvador.

184.    As pleaded with respect to the ambush and killings, Defendant commanded, conspired with, and/or aided and abetted other members of the Salvadoran military in committing the acts of extrajudicial killing set forth above.

185.    The killing of Jan Kuiper inflicted severe mental pain and suffering on his family members, including Plaintiff.

186.    As a direct and proximate result of the wrongful killing of Jan Kuiper by soldiers under Defendant's command, Plaintiff has and will continue to suffer from loss of sibling companionship.

187.    As a result of the extrajudicial killing of Jan Kuiper, Plaintiff has suffered damages in an amount to be determined at trial.

188.    Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and exhibited a reckless indifference to the rights of decedent Jan Kuiper and the rights of Plaintiff. Consequently, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

Plaintiff demands judgment against Defendant as follows:

(a)    Compensatory damages;

(b)    Punitive damages;

(c)    Declaratory relief declaring that Defendant is responsible for the extrajudicial killing of Jan Kuiper;

(d)    Prejudgment interest as allowed by law;

(e)    Reasonable attorneys' fees, costs, and expenses; and,

(f)     Such other and further relief as the court may deem just and proper.

Plaintiff requests a trial by jury for the claim for relief and all triable issues.

Dated: October 9, 2024          By:

/s/ Michelle S. Kallen
MICHELLE S. KALLEN (VSB No. 93286)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
Email: MKallen@Jenner.com

JASON P. HIPP (*pro hac vice pending*)
JENNER & BLOCK LLP
1165 6th Avenue
New York, NY 10036
Tel: (212) 891-1600
Email: JHipp@Jenner.com

ZOË HIGGINS REINSTEIN (*pro hac vice pending*)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
Email: ZReinstein@Jenner.com

CLARET VARGAS (*pro hac vice pending*)
DANIEL MCLAUGHLIN (*pro hac vice pending*)
CARMEN K. CHEUNG (*pro hac vice pending*)
CENTER FOR JUSTICE & ACCOUNTABILITY
268 Bush Street #3432
San Francisco, CA 94104
Tel: (415) 544-0444
Email: cvargas@cja.org
dmclaughlin@cja.org
ccheung@cja.org

*Attorneys for Plaintiff Gert Jannes Kuiper*