IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| GERT JANNES KUIPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:24-cv-1785 (RDA/LRV) |
| | ) | |
| MARIO ADALBERTO REYES MENA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant's Motion to Dismiss or Stay (Dkt. 22) and Plaintiff's Motion for Sur-Reply (Dkt. 31).  This Court has dispensed with oral argument as it would not aid in the decisional process.  *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J).  This matter is fully briefed and ripe for disposition.  Considering Plaintiff's Complaint (Dkt. 1), Defendant's Motion, Defendant's Memorandum in Support (Dkt. 23), Plaintiff's Opposition (Dkt. 28), Defendant's Reply (Dkt. 30), Plaintiff's Motion, Plaintiff's Memorandum in Support of its Motion for Sur-Reply (Dkt. 32), and Defendant's Opposition to the Sur-Reply (Dkt. 34), this Court DENIES Defendant's Motion to Dismiss and GRANTS Plaintiff's Motion for Sur-Reply for the reasons that follow.

## I.  BACKGROUND

### A.  Factual Background[1]

On March 17, 1982, four Dutch journalists—producer and editor Jan Kuiper, reporter Koos Koster, cameraman Johannes "Joop" Willemsen, and sound technician Hans ter Laag (the "Dutch

---

[1] For purposes of considering the Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Journalists")—and their guides headed to guerrilla-controlled territory in Chalatenango, El Salvador, to report on the devastating human toll of the country's civil war. Dkt. 1 ¶ 1. They were ambushed and killed by a Salvadoran military patrol that was stationed at the El Paraíso base of the Salvadoran Army, and under the command of Defendant Mario Adalberto Reyes Mena ("Reyes" or "Defendant"). *Id.* Plaintiff Gert Jannes Kuiper is a Dutch citizen residing in the Netherlands. *Id.* ¶ 32. Plaintiff is the brother of decedent Jan Kuiper and is his closest living direct relative. *Id.* ¶ 33.

### 1. State Violence Against Civilians and Targeting of Independent Media During the Armed Conflict in El Salvador

As alleged in the Complaint, from 1980 to 1992, El Salvador was ravaged by a civil war between the Salvadoran government and the Farabundo Martí National Liberation Front ("FMLN" for its name in Spanish). *Id.* ¶¶ 3, 43. In 1992, the Salvadoran government and the FMLN reached a peace agreement. *Id.* ¶ 44. As part of the peace accord, a United Nations-led truth commission was established to investigate crimes committed by both sides of the conflict. *Id.* The U.N. Truth Commission's investigation focused on "serious acts of violence" committed during the civil war, including extrajudicial killings, enforced disappearances, and torture. *Id.* In its report, the U.N. Truth Commission concluded that more than 75,000 civilians were killed and another 8,000 were forcible disappeared, with the vast majority of these crimes committed by the Salvadoran military and state security forces (collectively, "Salvadoran Security Forces" or "SSF") and their paramilitary allies. *Id.* ¶ 45. The U.N. Truth Commission found that the SSF and their paramilitary allies engaged with impunity in campaigns against civilians, murdering politicians, teachers, union leaders, university students, human rights activists, priests, nuns, journalists, and other notable figures in Salvadoran society. *Id.* ¶ 46. State institutions actively collaborated in or turned a blind eye to these killings. *Id.*

The SSF considered independent media members and their public reporting as a threat. *Id.* ¶ 47.  At the time, independent media coverage of the SSF's gross human rights abuses imperiled the support the Salvadoran government received from allied governments. *Id.* ¶ 48.  In the Fall of 1981, for example, the U.S. Congress enacted a law requiring that, before providing U.S. aid to El Salvador, the President of the United States had to certify that the Salvadoran government was adhering to a series of conditions, including complying with human rights standards, controlling the excesses of its military, and investigating the 1980 rape and murder of four American women in El Salvador. *Id.* ¶ 49.  Independent media coverage of the SSF's human rights abuses also helped to fuel public protests and activism internationally, including in the United States, that were critical of the Salvadoran government. *Id.* ¶ 50.

The SSF systematically targeted Salvadoran journalists and news outlets that did not report favorably on the government. *Id.* ¶ 51.  Independent media outlets were bombed. *Id.*  Editors and journalists were threatened, attacked, killed, or disappeared until the outlets closed. *Id.*  For example, the publisher of *El Independiente*, the last existing independent newspaper in El Salvador, stated that he fled the country "not because of lack of the Salvadoran people's support for idealistic journalism, but because, after the takeover of my office and machinery, after the capture of my employees and perhaps even the eventual disappearance of my family and myself, there would be absolute silence about the facts." *Id.* ¶ 52.

Foreign journalists did not fare much better. *Id.* ¶ 53.  The SSF viewed foreign journalists as siding with the FMLN. *Id.* According to the Committee to Protect Journalists, in the two years that preceded the Dutch Journalists' killings, 26 journalists—foreign and Salvadoran—had been killed. *Id.*  In 1980, an American freelance journalist was forcibly disappeared. *Id.* ¶ 54.  His mutilated remains were found in 1983, only after his family's congressional representative

managed to make the investigation of the journalist's death part of the certification requirements for U.S. aid to El Salvador.  *Id.*  In early March 1982, an SSF-affiliated death squad circulated a list of twenty-four names, including fourteen American journalists and a United States Embassy public affairs officer, calling for "death to traitors of Democracy."  *Id.* ¶ 55.  The death squad called them "pseudo-journalists in the service of international subversion who have been condemned to death by the patriots."  *Id.*

The situation grew particularly acute in the lead-up to the March 28, 1982 Constitutional Assembly elections, when hundreds of foreign journalists came to El Salvador to cover the national elections.  *Id.* ¶ 56.  In the prior month, controversy over the U.S. administration's certification of El Salvador's human rights record and efforts to investigate the forced disappearance of the American freelance journalist, and the rape and murder of four American nuns who were ministering in El Salvador, had resulted in negative press coverage of the Salvadoran government and the SSF.  *Id.*  With such an extensive contingent of foreign journalists present in the country in the early months of 1982, it became increasingly important for the SSF to crack down on negative independent reporting from El Salvador that might further tarnish the government's image internationally.  *Id.* ¶ 57.  It was in this heightened climate of repression and threats against independent media that the Dutch Journalists arrived in El Salvador.  *Id.* ¶ 58.

### 2. The Salvadoran Security Forces Perceived the Dutch Journalists and Their Reporting as a Threat.

The Complaint asserts that, in February 1982, the Dutch Journalists traveled to El Salvador on assignment from Interkerkelijke Omroep Nederland ("IKON"), a Dutch television and radio broadcast affiliated with the Protestant Church in the Netherlands, to report on the devastating toll of the country's civil war, including planned reports from San Salvador, El Salvador's capital, and from FMLN-controlled areas.  *Id.* ¶¶ 5, 59.  Both Kuiper and Koster had previously traveled to El

4

Salvador and published stories critical of the SSF. *Id.* ¶ 60. In 1980, Koster and Kuiper's team produced a documentary on Salvadoran civil defense units and SSF-aligned death squads that garnered international attention. *Id.* ¶ 61. That same year, Koster had interviewed Archbishop Óscar Romero, a leading figure for peace in El Salvador. *Id.* ¶ 62. Shortly after, in March 1980, the Archbishop delivered a sermon over the national radio pleading with the SSF to stop the killing and repression of the Salvadoran people. *Id.* The next day, the Archbishop was assassinated under orders of high-ranking officials from the SSF. *Id.*

On February 24, 1982, the Dutch Journalists arrived in San Salvador and checked in at the Hotel Alameda. *Id.* ¶ 63. According to a de-classified U.S. diplomatic cable, at the time of the Dutch Journalists' arrival in San Salvador, "it was generally known that the four were making a 16mm film sympathetic to the guerrillas, similar to the one they made in 1980." *Id.* ¶ 64. On or about March 7, 1982, the Dutch Journalists visited Mariona Prison in San Salvador, where political prisoners, principally union leaders, were held. *Id.* ¶ 65. They interviewed political prisoners who were part of the leadership inside the detention center, and documented scars and other tangible evidence of torture on the bodies of the detainees. *Id.* The Dutch Journalists sent the footage of the interviews from Mariona Prison back to the Netherlands. *Id.*

On March 10, 1982, Hotel Alameda staff informed the Dutch Journalists that members of the notorious Treasury Police—an intelligence agency known for its human rights violations and connections to death squads—had been looking for them at the hotel. *Id.* ¶¶ 6, 66. On the morning of March 11, 1982, about twenty members of the Treasury Police arrived at the Hotel Alameda and arrested Koster for his supposed links to the FMLN. *Id.* ¶ 68. The remaining Dutch Journalists decided to accompany him to the Treasury Police headquarters as a showing of solidarity. *Id.*

At the Treasury Police headquarters, the Dutch Journalists were questioned by the head of the Treasury Police, Col. Francisco Antonio Morán, who claimed that Koster's contact information was found among the possessions of a captured FMLN member. *Id.* ¶¶ 67, 69. The Association of Foreign Correspondents quickly learned that the Dutch Journalists were being questioned at the Treasury Police headquarters and mobilized to spread news of Koster's arrest. *Id.* ¶ 70. As detailed in declassified U.S. diplomatic cables, the United States and Dutch Embassies also engaged with the Salvadoran government to secure Koster's release. *Id.* ¶ 71. After four hours of questioning, Col. Morán released Koster and his colleagues, once Koster signed a document stating he was not mistreated. *Id.* ¶ 72.

When the Dutch Journalists returned to the Hotel Alameda, they observed that their hotel rooms had been searched while they were detained, though nothing appeared to be missing. *Id.* ¶ 73. Jan Schmeitz, a freelance journalist from the Netherlands who was staying at the same hotel, advised the Dutch Journalists to take their detention by the Treasury Police seriously and to be extremely careful while in El Salvador. *Id.* ¶ 74. The next day, March 12, 1982, a newspaper aligned with the SSF published a photo of Koster and his colleagues—including Jan Kuiper—as they walked through the Treasury Police headquarters' patio on their way out of the compound. *Id.* ¶ 75. The accompanying article, which largely copied a press release issued by the Salvadoran Armed Forces Press Committee, was headlined: "Foreign Journalist a Contact for Subversives." *Id.* Foreign and Salvadoran journalists warned the Dutch Journalists that being the focus of a Treasury Police investigation was dangerous and attempted to dissuade them from continuing their reporting. *Id.* ¶ 76. Some advised them to leave the country immediately given the risks to their safety. *Id.*

The Dutch Journalists decided to press on with their independent reporting. *Id.* ¶ 77. On or about March 15, 1982, the Dutch Journalists finalized their plan to travel from San Salvador to an FMLN-controlled zone in the department of Chalatenango to document the lives of civilians in those areas. *Id.* ¶ 78. On March 16, 1982, Koster borrowed a mini-bus marked with the word "PRENSA" ("Press" in Spanish) from Schmeitz for the planned trip. *Id.*

### 3. Salvadoran Soldiers Stationed at the El Paraíso Base in March 1982 Operated Under Defendant's Command.

The Complaint further alleges that the SSF and the FMLN both controlled portions of the department of Calatenango. *Id.* ¶ 79. The SSF controlled the area immediately around El Paraíso, whereas the surrounding areas were disputed between the government and the FMLN. *Id.* About four miles east of El Paraíso was not considered safe for the SSF. *Id.* The Fourth Infantry Brigade of the Salvadoran Army (the "Fourth Brigade") was the military unit responsible for Chalatenango and was headquartered at a base in El Paraíso. *Id.* ¶¶ 38, 80.

In March 1982, Defendant, a colonel in the Salvadoran Army, was the commander of the Fourth Brigade. *Id.* ¶ 81. At that time, members of the Atonal Battalion were stationed at the El Paraíso base while receiving training from American military advisors present at the base. *Id.* ¶ 83. The Atonal Battalion was one of the three Rapid Deployment Infantry Battalions ("BIRI" for its name in Spanish), highly trained specialized anti-guerrilla combat units. *Id.* ¶ 84. Defendant had command over all Salvadoran soldiers stationed at the El Paraíso base, including members of the Fourth Brigade and members of the Atonal Battalion. *Id.* ¶ 82.

Defendant was aware of the Dutch Journalists' plans to travel to Chalatenango on March 17, 1982, to access FMLN-controlled areas. *Id.* ¶ 85. According to the U.N. Truth Commission Report, on or around March 16, 1982, "a meeting was held in which officers of the General Staff of the Fourth Brigade, including its Commander, [Defendant] Colonel Mario A. Reyes Mena, and

7

officers of the Atonal [BIRI] took part." *Id.*   The Report continues, "According to those interviewed, [an] ambush was planned at that meeting, on the basis of precise intelligence data indicating that the journalists would try to enter the zone controlled by the FMLN via that route the next day." *Id.*

### 4. The Ambush and Killing of the Dutch Journalists

The Complaint asserts that, on the morning of March 17, 1982, a patrol of soldiers stationed at the El Paraíso base and acting under Defendant's command departed the base to ambush the Dutch Journalists near Santa Rita. *Id.* ¶ 86.  Defendant was present at the El Paraíso base as the patrol departed and when it returned. *Id.* ¶ 87.  It was usual practice for patrols to be in regular radio communication with the base while in the field. *Id.*  The patrol set atop two hills overlooking a hollow. *Id.* ¶ 88.  The Dutch Journalists were expected to pass through the hollow on their way to FMLN-controlled territory. *Id.*  Once in position, the patrol waited for the Dutch Journalists to arrive. *Id.* ¶ 89.

The same day, a German journalist, Armin Friedrich Wertz, drove the Dutch Journalists in their borrowed mini-bus marked "PRENSA" ("Press") to the meeting point in the municipality of Santa Rita, department of Chalatenango, picking up FMLN guides in San Salvador, including a 12-year-old boy. *Id.* ¶ 90.  On the way, Wertz observed that they were being followed by a Jeep Cherokee, a vehicle often used by the Salvadoran Armed Forces. *Id.* ¶ 91.  The Jeep turned off the road just before their last turn to the meeting point. *Id.*  The meeting point was near the San Salvador-Chalatenango Road, near the turn-off for Santa Rita. *Id.* ¶ 92.  The drop-off point was approximately four miles from the El Paraíso base. *Id.*

At around 5 p.m., the Dutch Journalists stopped on the side of a road. *Id.* ¶ 93.  There, they were met by additional guides. *Id.*  Wertz agreed that he would return to collect the Dutch

Journalists on March 21. *Id.* ¶ 94. Thereafter, the Dutch Journalists, all of whom were unarmed, and their guides set off on a path leading to a hollow opposite a hill, walking in a single file with the journalists in the middle. *Id.* When they reached the hollow—about 250 meters along the path—the group suddenly came under heavy fire from the patrol, deployed on the two hills overlooking the hollow. *Id.* ¶ 95.

The patrol killed all four of the Dutch Journalists. *Id.* ¶ 96. Two of the Dutch Journalists were immediately struck by the gunfire and fell to the ground. *Id.* ¶ 97. The other two journalists attempted to escape by running toward a nearby riverbed, but they were shot and killed by members of the patrol. *Id.* Jan Kuiper, Plaintiff's brother, was injured by shrapnel and shot twice in the head. *Id.* ¶ 98.

The patrol killed all but one of the FMLN guides. *Id.* ¶ 99. The sole survivor, Martín, later testified before the Dutch Parliament in May 1982. *Id.* In his testimony, Martín described hearing the sounds of gunshots coming from two separate directions, and dropping to the ground, rolling, and attempting to cover himself in response. *Id.* ¶ 100. He looked back and saw two of the Dutch Journalists, one in a white shirt and one in a red shirt, lying on the ground and no longer moving. *Id.*

Once the attack was over, the patrol radioed the El Paraíso base to report back. *Id.* ¶ 101. Defendant dispatched a vehicle to collect the patrol and return them to their base. *Id.* Upon their return, the patrol celebrated their success and referred to their mission as an "ambush." *Id.*

*5. The Salvadoran Government and its Security Forces Tried to Cover Up the Truth About the Ambush and Killing of the Dutch Journalists.*

The Complaint asserts that the Salvadoran government and the SSF worked to promote a false narrative regarding the ambush, namely that the patrol was already in the area, waiting for a truck to pick them up by the side of the main road, after spending the day investigating FMLN

activity.  *Id.* ¶ 102.  The SSF claimed that, as the patrol was waiting for their transport, the soldiers were fired upon by a group of guerrillas.  *Id.*  According to this false narrative, a firefight began, and the Dutch Journalists were mistaken for guerrillas and killed in the crossfire.  *Id.*  Consistent with the false narrative, Defendant failed to discipline his subordinates for the killings, refused to admit that the targeted ambush was intentional, and refused to admit his role in its planning.  *Id.* ¶ 103.

In the days following the killings, the SSF sought to intimidate individuals connected to the Dutch Journalists.  *Id.* ¶ 104.  In the early morning of March 18, 1982, Treasury Police agents went to Mariona Prison, where the Dutch Journalists had conducted interviews days earlier.  *Id.* ¶ 105.  The agents ordered all the political prisoners to lay on the floor face down and proceeded to read aloud the names of roughly ten prisoners: the leadership team who had met with the Dutch Journalists.  *Id.*  Those whose names were called were then singled out for severe beatings and torture over the next several hours.  *Id.*  Two days after the Dutch Journalists' murders, Schmeitz, their fellow Dutch journalist friend and colleague, received threatening phone calls, demanding that he stop looking into the deaths of his colleagues and stating that there was "a fifth coffin" waiting for him.  *Id.* ¶ 107.  Schmeitz was convinced he was in serious danger after speaking to the Dutch Ambassador, who informed him that El Salvador's President had said that he could not guarantee Schmeitz's safety.  *Id.* ¶ 108.  Soon after hearing this, Schmeitz received a call from the press officer of the U.S. Embassy, offering an armored vehicle to take him to the airport.  *Id.*

*6.  Facts Uncovered by Investigations, Including a Contemporaneous Investigation by U.S. Officials, Belied the False Narrative Advanced by the Salvadoran Government and its Security Forces.*

The Complaint asserts that, on March 18, 1982 at or around 2:20 a.m., Col. John McKay, then-Assistant Defense Attaché at the U.S. Embassy in San Salvador, received a phone call telling

him that foreigners had been killed and their bodies were at the El Paraíso base.  *Id.* ¶ 111.  Col. McKay got a helicopter transport from Salvadoran forces stationed at the Central Headquarters in San Salvador.  *Id.* ¶ 112.  Col. McKay arrived at the El Paraíso base around 4 a.m. on March 18. *Id.* ¶ 114.  When U.S. military officers visited Salvadoran military facilities, the usual practice was for the commanding officer to meet with the U.S. representative.  *Id.*  When Col. McKay asked to meet with Defendant, the commander of the Fourth Brigade, he was told that Defendant was unavailable.  *Id.*

Col. McKay examined the bodies of the Dutch Journalists.  *Id.* ¶ 115.  Col. McKay saw gunpowder residue on two of the bodies: one was wounded twice in the upper chest, and the other one had a head wound near the bridge of the nose.  *Id.*  He turned the head of one of the deceased journalists and saw an exit wound at the back of the head.  *Id.*  Based on his prior combat experience, Col. McKay concluded from the wounds that these two Dutch Journalists had been shot from a close range.  *Id.*  Col. McKay returned to San Salvador and went directly to the U.S. Ambassador's residence, where he informed him in person of the killings.  *Id.* ¶ 116.  The U.S. Government immediate sent its embassy officials to investigate the killings.  *Id.* ¶ 117.

Later that same morning, only a few hours after his first visit, Col. McKay returned to El Paraíso to continue his investigation of the killings with at least one additional U.S. Government official, a U.S. Embassy political officer.  *Id.* ¶ 118.  The U.S. Embassy sent a (now declassified) cable to the U.S. Department of State following the second on-site investigation into the killings. *Id.* ¶ 119.  According to the cable, the U.S. investigators examined the bodies of the four Dutch Journalists at the El Paraíso base and concluded that all died from multiple gunshot wounds.  *Id.* ¶ 120.  The powder burns indicated that the Dutch Journalists were killed at a distance expected to be no greater than 75 meters.  *Id.*  As noted in the cable, U.S. military advisors who were on-site

at El Paraíso on March 17 and 18, 1982, reported to the U.S. investigators that the Salvadoran soldiers returning from their mission at around 8 p.m. on the night of March 17 "expressed elation at their success and referred to their mission as an 'ambush.'"  *Id.* ¶ 121.  One U.S. military advisory noted that the patrol was about three kilometers beyond the normal patrol perimeter, in a solidly guerilla area, and observed that it was not common for patrols to be out after dark—sunset was at 6:02 p.m. in El Salvador on March 17, 1982.  *Id.*

The U.S. investigators, including Col. McKay, then headed to the site of the killing, accompanied by Salvadoran soldiers who claimed to have been part of the patrol.  *Id.* ¶ 122.  The cable noted that the soldiers offered a "nearly uniform version of the patrol and firefight," which differed from the "information gathered at the site of the encounter."  *Id.* ¶ 123.  The soldiers showed the U.S. investigators the spots from which they claimed to have fired and maintained that they did not advance from their original shooting positions.  *Id.* ¶ 124.  While the U.S. investigators found shell casings in the original locations indicated by the soldiers, they also found "numerous" shell casings in other locations, indicating that the soldiers had advanced toward the Dutch Journalists while firing.  *Id.*  A sergeant who led the patrol also acknowledged to the U.S. investigators that he killed two of the journalists at a range of approximately 25 meters as they tried to escape toward a small riverbed.  *Id.*

The cable noted that the U.S. investigators recovered numerous M-60 shell casings from the site of the killing.  *Id.* ¶ 125.  The Salvadoran soldiers also claimed to have taken "heavy fire," including grenade fire, from about 20 to 35 guerrillas and showed the hilltops from which they claimed guerrillas had fired.  *Id.* ¶ 127.  The U.S. investigators examined these locations and found "no extensive evidence of guerrilla fire," including no evidence of any grenade fire in those areas and no evidence that the ground had been disturbed.  *Id.*  The cable noted that the soldiers attempted

to explain the discrepancy by "insist[ing] that the guerrillas had picked up all of their shells before leaving, even though it was almost dark." *Id.* Based on his investigation at the site of the killing and his extensive combat experience, Col. McKay concluded that the patrol was set up in a tactical position atop two hills overlooking the path below where the Dutch Journalists had planned to pass, creating a "kill zone" that bore the hallmarks of a classic ambush. *Id.* ¶ 128.

Later, the Dutch government despite a lack of cooperation from the Salvadoran government—carried out its own investigation into the killing of the Dutch Journalists. *Id.* ¶ 129. When the Dutch Ambassador requested to interview the sergeant and soldiers who carried out the ambush in the days following the killings, for example, the Salvadoran government refused to provide authorization. *Id.* The Dutch investigative team visited the site of the killings as well as El Paraíso, accompanied by Col. McKay. *Id.* Based on the evidence the Dutch mission could gather, the Dutch government similarly concluded that the Salvadoran government and its Security Forces' account of the death of the Dutch Journalists was "unbelievable and contestable." *Id.*

Following the end of the civil war in 1992, the U.N. Truth Commission was tasked with conducting investigations into serious acts of violence committed during the civil war by both sides. *Id.* ¶ 130. In its final report, issued on March 15, 1993, the U.N. Truth Commission highlighted the killing of the Dutch Journalists as among the most emblematic crimes committed by state actors during the conflict. *Id.* Not all emblematic cases discussed by the U.N. Truth Commission name a perpetrator. *Id.* ¶ 131. To identify specific perpetrators, the U.N. Truth Commission's methodology required "overwhelming evidence" linking the perpetrator to that atrocity, including confirmation of the relevant event and perpetrator by multiple credible sources, and gave the alleged perpetrator the opportunity to provide his version of events. *Id.* After its investigation into the Dutch Journalists' killings, which included interviews with numerous

13

witnesses, the U.N. Truth Commission concluded that "the ambush was set up deliberately to surprise and kill the journalists and their escort; that the decision to ambush them was taken by Colonel Mario A. Reyes Mena, Commander of the Fourth Brigade, with the knowledge of other officers; that no major skirmish preceded or coincided with the shoot-out in which the journalists were killed; and, lastly, that [Defendant] and other soldiers concealed the truth and obstructed the judicial investigation." *Id.* ¶ 132.

For the foreign journalists remaining in El Salvador, the killing of the Dutch Journalists, along with the subsequent cover-up and broader campaign of intimidation, sent a clear message: stop covering the guerrillas. *Id.* ¶ 133.

While the Dutch Journalists' murder was among the most brazen attacks on foreign journalists by the SSF, it was not the last or only one. *Id.* ¶ 136. The SSF's targeting of Salvadoran and foreign journalists continued throughout the civil war. *Id.*

*7. Decades of Obstacles to Accountability and Extraordinary Circumstances Prevented Plaintiff from Filing this Suit until Now.*

The Complaint further alleges that, in the immediate aftermath of the killing of the Dutch Journalists, the families of the Dutch Journalists, including Plaintiff, could not learn the truth of what took place, how their family members died, or who was responsible for their deaths. *Id.* ¶ 141. The Salvadoran government and its Security Forces' cover-up and false narrative about how the killings took place and their threats to witnesses and journalists who sought to shed light on the incident obstructed public knowledge and Plaintiff's knowledge about the killings. *Id.* ¶ 142. Although criminal proceedings in the Court of First Instance at El Dulce Nombre de María were initiated following the killing of the Dutch Journalists (the "Initial Criminal Proceedings"), they quickly hit a roadblock when the military refused to make any relevant military personnel

available to the investigative judge, Dora del Carmen Gómez de Claros, for questioning. *Id.* ¶ 143. Under the Salvadoran criminal procedure laws in force at the time, investigations were led by investigative judges. *Id.* In 1988, after Judge Claros was forced to flee El Salvador following death threats for her work in this case, the Initial Criminal Proceedings were terminated without any additional information being released to the Dutch Journalists' families. *Id.* ¶ 144.

In 1992, with the end of the civil war and the creation of the U.N. Truth Commission, there appeared, for the first time, a potential opportunity to properly investigate the killings of the Dutch Journalists. *Id.* ¶ 145. In its final report, issued on March 15, 1993, the U.N. Truth Commission found that the Salvadoran government failed to meet its obligation to investigate, bring to trial, and punish guilty parties, as required under international law. *Id.* The U.N. Truth Commission also stated that the then-President of the Supreme Court of El Salvador "failed to cooperate" with the U.N. Truth Commission's investigation. *Id.* On March 20, 1993, days after the U.N. Truth Commission's Report became public, the Salvadoran government enacted the Amnesty Law. *Id.* ¶ 146. The Amnesty Law shielded the SSF and FMLN forces from prosecution for human rights abuses committed during the civil war and protected offenders from civil liability. *Id.* It made domestic investigations and prosecutions for crimes committed in the context of the armed conflict impossible. *Id.* Even with the protection of the Amnesty Law, the SSF continued to block access to key evidence, such as documents, military and security forces personnel information and interviews, related to its involvement in human rights abuses during the civil war, including targeted killings carried out by the SSF. *Id.* ¶ 147.

In 2012, the Inter-American Court of Human Rights issued a binding judgment on El Salvador in the case of *El Mozote v. El Salvador*, holding that the provisions of the Amnesty Law that had thus far prevented the investigation, prosecution and punishment of those responsible for

crimes against humanity perpetrated during the civil war were handled with impunity, violated international law, and were incompatible with the American Convention on Human Rights, to which El Salvador is a party. *Id.* ¶ 148. Notwithstanding this judgment, the Amnesty Law remained in effect until 2016, when the Salvadoran Supreme Court, relying on Inter-American jurisprudence and other international humanitarian law and human rights instruments, declared unconstitutional all the articles of the Amnesty Law that prevented the investigation of crimes against humanity and war crimes committed during the civil war. *Id.* ¶ 149. The Salvadoran Supreme Court held the Amnesty Law to be invalid as to all the cases described in the U.N. Truth Commission, including the killing of the Dutch Journalists. *Id.* Following this ruling, in December 2016, the Salvadoran Prosecutor General created the Salvadoran Human Rights Unit to investigate crimes committed during the civil war. *Id.* ¶ 150.

Despite the Salvadoran Supreme Court's ruling, the SSF continued to block access to evidence and to obstruct any investigations into its abuses during the civil war, even in the face of court orders. *Id.* ¶ 151. For example, in the investigation into the December 1981 killing of more than one thousand villagers in the El Mozote Massacre, the Salvadoran military refused to provide access to its archives, despite a court order to do so. *Id.*

In March 2018, Plaintiff filed a criminal complaint with the Salvadoran Attorney General's Office requesting an investigation of the Dutch Journalists' murders. *Id.* ¶ 152. In response, the Prosecutor's Office began prosecuting the case, and sent the file to a court in Dulce Nombre de María, the Chalatenango municipality where the case was first opened in 1982. *Id.* Two Salvadoran human rights organizations, one of which is Plaintiff's legal representative, conducted their own investigation and developed additional evidence. *Id.* ¶ 153.

In September 2018, Plaintiff learned of Defendant's location and presence in Centreville, Virginia, when a Dutch television program aired a documentary on the killings that tracked Defendant to his current residence. *Id.* ¶ 154. In 1984, Defendant had relocated to the United States as a military attaché for the Salvadoran government based in Washington, D.C. *Id.* ¶ 39.

On July 16, 2021, Plaintiff filed a renewed criminal complaint in El Salvador naming Defendant and two other former officers as responsible for the extrajudicial killing of Plaintiff's brother, Jan Kuiper. *Id.* ¶ 155. On September 22, 2022, Plaintiff asked the court to order Defendant's arrest. *Id.* Two weeks later, the Salvadoran Attorney General's Office made the same request. *Id.* In November 2022, the court issued an order indicting three former high-ranking officers for the killing of the Dutch Journalists, including Defendant. *Id.* ¶ 158. Two of these former officers, Gen. José Guillermo García and Col. Francisco Antonio Morán, reside in El Salvador and were arrested following the issuance of the indictments. *Id.* ¶ 159. Following the indictment, Defendant, who resides in the United States, has avoided arrest in El Salvador by no longer returning to El Salvador. *Id.* ¶ 160. Before being indicted, Defendant regularly traveled to El Salvador. *Id.*

In 2023, pursuant to a request by the judiciary in El Salvador, INTERPOL issued a Red Notice for Defendant's provisional arrest, but no action has yet been taken on the Red Notice. *Id.* ¶ 161. Further, no information suggests that extradition or deportation will be prompt or even possible, despite a Salvadoran court order to the Salvadoran executive branch to seek Defendant's extradition. *Id.* ¶ 162.

## B. Procedural Background

On October 9, 2024, Plaintiff filed his Complaint in this Court, alleging Defendant violated the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992)

(codified at 28 U.S.C. § 1350 note).  Dkt. 1.  On November 22, 2024, Defendant filed a Motion to Dismiss, or, Alternatively, Stay.  Dkt. 22.  After receiving an extension, Dkt. 26, Plaintiff filed his Opposition on December 20, 2024, Dkt. 28.  On January 8, 2025, Defendant filed his Reply.  Dkt. 30.  On January 15, 2025, Plaintiff filed a Motion for Leave to File Sur-Reply.  Dkt. 31.  On January 16, 2025, Defendant filed his Opposition to the Motion for Leave to File Sur-Reply.  Dkt. 34.

## II.  LEGAL STANDARD

### A.  Rule 12(b)(1) Standard

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal when the Court lacks jurisdiction over the subject matter of the action.  A district court must dismiss an action over which it lacks subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1), (h)(3).  In considering a 12(b)(1) motion to dismiss, the burden is on the plaintiff to prove that subject-matter jurisdiction is proper.  *See United States v. Hays*, 515 U.S. 737, 743 (1995) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *see also Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

There are two ways in which a defendant may prevail on a 12(b)(1) motion.  First, a defendant may attack the complaint on its face when the complaint "fails to allege facts upon which subject matter jurisdiction may be based."  *Adams*, 697 F.2d at 1219.  Under this method of attack, all facts as alleged by the plaintiff are assumed to be true.  *Id.*  Alternatively, a 12(b)(1) motion to dismiss may attack the existence of subject-matter jurisdiction over the case apart from the pleadings.  *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).  In such a case, "[n]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the

jurisdictional claims." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.3d 884, 891 (3d Cir. 1977).

## B.  Rule 12(b)(6) Standard

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).  "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'"  *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)).  Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion, *see Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015), but they "may consider documents . . . attached to the motion to dismiss, as long as they are integral to the complaint and authentic[,]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

C.  Rule 12(b)(7) Standard

Under Federal Rule of Civil Procedure 12(b)(7), a party may move for dismissal "for failure to join a party under Rule 19." *Id.*  When faced with a Rule 12(b)(7) motion to dismiss, the court engages in a two-step inquiry.  First, it must determine whether the absent party is required under Rule 19 because complete relief could not be provided without that party's involvement in the case, or because the absent party claims an interest in the action such that the result of the case could impede that party's ability to protect its interest or impose double or inconsistent obligations.  Fed. R. Civ. P. 19(a)(1); *Owens–Illinois, Inc. v. Meade,* 186 F.3d 435, 440 (4th Cir.1999).  Second, "[i]f a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Fed. R. Civ. P. 19(b).

III.  ANALYSIS

In his Motion, Defendant makes several arguments for dismissal of the instant action: (1) the Court lacks subject matter jurisdiction because Defendant has foreign sovereign immunity; (2) the TVPA claim is barred by the ten-year statute of limitations; (3) the TVPA may not be applied retroactively; (4) Plaintiff lacks standing; and (5) Plaintiff has not exhausted his remedies in El Salvador.  In the alternative, Defendant argues that, absent dismissal, the Court should issue a stay.  The Court will address each argument in turn.

A.  Plaintiff's Claim is Not Barred by the FSIA or Common Law Immunity.

Defendant argues that the Court lacks subject matter jurisdiction over Plaintiff's TVPA claim because he is immune from suit (1) under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604 *et seq.*, and (2) pursuant to conduct-based immunity under the common law.

Dkt. 23 at 6-17.  Both of these arguments are foreclosed by Supreme Court and/or Fourth Circuit precedent.

*1. Defendant Is Not Entitled to Immunity Under the Foreign Sovereign Immunities Act.*

As the Fourth Circuit has explained, "FSIA—based on its text, purpose and history— governs only foreign state sovereign immunity, not the immunity of individual officials." *Yousuf v. Samantar*, 699 F.3d 763, 767 (4th Cir. 2012) (citing *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010) ("Reading the FSIA as a whole, there is nothing to suggest we should read 'foreign state' in § 1603(a) to include an official acting on behalf of the foreign state, and much to indicate that this meaning was not what Congress enacted.")).  Thus, "the common law, not the FSIA, governs the claims to immunity of individual foreign officials." *Id.* (citing *Samantar*, 560 U.S. at 325 ("[W]e think this case, in which respondents have sued petitioner in his personal capacity and seek damages from his own pockets, is properly governed by the common law because it is not a claim against a foreign state as the [FSIA] defines that term.")).  Accordingly, as an individual foreign official, Defendant is not entitled to immunity under the FSIA.

However, the Supreme Court has noted two related avenues that might provide for the dismissal of a case based on the FSIA immunity of the relevant foreign state: (1) where the foreign state is the real party in interest; and (2) where the foreign state itself—or a political subdivision, agency, or instrumentality thereof—is a required party warranting dismissal under Federal Rule of Civil Procedure 12(b)(7).  *Samantar*, 560 U.S. at 324-25.  Defendant here raises each of these arguments, and the Court will address them in turn.

a. El Salvador Is Not the Real Party in Interest.

This nation's Supreme Court has noted that "it may be the case that some actions against an official in his official capacity should be treated as actions against the foreign state itself, as the

21

state is the real party in interest." *Samantar*, 560 U.S. at 325 (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." (citation omitted))).  Defendant argues that, because Plaintiff alleges that Defendant "was acting in his official capacity as an officer of the Salvadoran military, and that his alleged conduct was then authorized by the Salvadoran government," El Salvador is the real party in interest.  Dkt. 30 at 8; *see also* Dkt. 23 at 13-15.  The Court disagrees for two independent reasons.

*First*, as noted above, the Supreme Court only identified this avenue as potentially available in "actions against an official *in his official capacity*" and cited its precedent distinguishing official-capacity suits (in which the government entity is the real party in interest) from personal-capacity suits (in which it is not) in 42 U.S.C. § 1983 actions.  *Samantar*, 560 U.S. at 325 (emphasis added) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).  In the Fourth Circuit, "when a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity."  *Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995).  In his Opposition, Plaintiff specifically stated that he is "suing Defendant in his personal capacity for his role in the ambush that targeted and killed the Dutch Journalists, and seeks damages from Defendant's 'own pockets.'"  Dkt. 28 at 15 (quoting *Samantar*, 560 U.S. at 325).  Unlike many official capacity claims, here the caption of the Complaint does not list Defendant's former title or relationship to El Salvador.  Dkt. 1 at 1.  The Complaint also seeks damages from Defendant personally, rather than from El Salvador.  Dkt. 1 ¶ 173 ("In addition to being *personally liable* for his own actions, Defendant is *jointly and severally liable* for the actions of his co-conspirators, all of which were actions undertaken in furtherance of a common plan, design, and scheme to commit

22

the ambush and killings.").  Accordingly, El Salvador is not the real party in interest in this case.
*See Samantar*, 560 U.S. at 325 ("And we think this case, in which respondents have sued petitioner
in his personal capacity and seek damages from his own pockets, is properly governed by the
common law because it is not a claim against a foreign state as the [FSIA] defines that term.").

The non-binding, out-of-circuit cases Defendant cites regarding *official capacity* claims
are, thus, inapposite and distinguishable.  *See Qandah v. Johor Corp.*, 2021 WL 5446767, at *6
(6th Cir. Nov. 22, 2021) (holding that the individual defendant was sued in his *official capacity*
because the "complaint's caption states that [plaintiff] is suing [the individual defendant] "as CEO
of [the state-owned corporation defendant]," plaintiff alleged that the individual defendant's
relevant actions were done "on behalf of" the state-owned corporation defendant, plaintiff "almost
exclusively" referred to the individual and state-owned corporation defendants collectively, and
plaintiff "made only a general demand for damages without specifying the source"); *Odhiambo v.
Republic of Kenya*, 930 F. Supp. 2d 17, 34–35 (D.D.C. 2013) (holding a case based on a breach of
contract between the plaintiff and the Kenyan government was in all respects a suit against the
Kenyan government in part because the individual defendants were sued in their official capacities
and damages were sought from the Kenyan government, not the individual defendants), *aff'd*, 764
F.3d 31 (D.C. Cir. 2014); *Li v. Li*, 2023 WL 2784872, at *4 (D.D.C. Apr. 5, 2023) (holding the
Chinese state was the real party in interest where each named individual defendant was sued in his
official capacity, there were no non-conclusory allegations that any individual defendant
personally ordered, participated in, or profited from the underlying offense, the complaint focused
on "an alleged longstanding Chinese policy," and there was no indication that plaintiffs sought
damages directly from the individual defendants), *aff'd*, 2024 WL 4601521 (D.C. Cir. Oct. 29,
2024); *Strange v. Islamic Republic of Iran*, 2016 U.S. Dist. LEXIS 200878, at *13-14 (D.D.C.

May 6, 2016) (holding that claims against former president of Iran, Mahmoud Ahmadinejad, and supreme leader of Iran, Ali Hosseini Khamenei, were "in effect no more than claims against the foreign state itself" because the plaintiffs alleged that Ahmadinejad and Khamenei were acting in their "official capacities," Defendant Iran had acted through them, and "for all intents and purposes, *Defendant Khamenei is the Iranian government*" (emphasis original)); *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 72 (D.D.C. 2013) (holding Defendant Iran was the "real party in interest" because plaintiffs had made clear that they were suing Khamenei and Ahmadinejad for acts taken "in their official capacity" on behalf of Iran, the plaintiffs asserted personal jurisdiction over Khamenei and Ahmadinejad on the basis of "the regime['s] contacts with the United States," and plaintiffs' allegations centered on "official policies"), *aff'd*, 782 F.3d 9 (D.C. Cir. 2015). These cases, which are out-of-circuit, do not guide the Court's analysis here, where Plaintiff's factual allegations, claims, and damages sought are substantially different from those in the cases cited by Defendant.

*Second*, even if this action would otherwise be interpreted as a suit against Defendant in his official capacity, the Fourth Circuit has held that certain acts, even if committed under color of law and in the course of employment with a foreign Sovereign, are "by definition, acts that are not officially authorized by the Sovereign." *Yousuf*, 699 F.3d at 776. These acts are violations of *jus cogens* norms, which are "peremptory norm[s] of general international law [that are] accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." *Id.* (quoting *Vienna Convention on the Law of Treaties* art. 53, May 23, 1969, 1155 U.N.T.S. 331); *see also Siderman de Blake,* 965 F.2d at 718 ("International law does not recognize an act that violates jus cogens as a sovereign act."); *Paul v.*

*Avril,* 812 F. Supp. 207, 212 (S.D. Fla. 1993) ("[A]cts ... [of torture, cruel, inhuman and degrading treatment, and arbitrary detention in violation of customary international law] hardly qualify as official public acts."). The Fourth Circuit has held that "summary execution" is "among these universally agreed-upon norms." *Yousuf,* 699 F.3d at 775 (citing Evan J. Criddle & Evan Fox–Decent, *A Fiduciary Theory of Jus Cogens,* 34 Yale J. Int'l L. 331, 331 (2009) (explaining that "jus cogens . . . include[s], at a minimum, the prohibitions against genocide; slavery or slave trade; *murder or disappearance of individuals*; torture or other cruel, inhuman, or degrading treatment or punishment; prolonged arbitrary detention" (emphasis added)); *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 n.20 (D.C. Cir. 1984) (Edwards, J., concurring) ("On the basis of international covenants, agreements and declarations, commentators have identified at least four acts that are now subject to unequivocal international condemnation: torture, *summary execution*, genocide and slavery." (emphasis added)); *Restatement (Third) of Foreign Relations Law* § 702 and cmt. n (identifying *murder*, torture and "prolonged arbitrary detention" as *jus cogens* violations)). Accordingly, Defendant's alleged extrajudicial killing in this case is a *jus cogens* violation, and, although alleged to have been done under color of law and in the course of employment with El Salvador, is legally treated as not having been officially authorized by El Salvador. *See Warfaa v. Ali,* 33 F. Supp. 3d 653, 663 (E.D. Va. 2014) ("The Fourth Circuit then held that a foreign official exceeds the scope of his authority any time he engages in an act that violates *jus cogens* norms. Because plaintiff alleges that defendant did exactly that, defendant's acts could not have been sanctioned by a foreign sovereign notwithstanding his position in the Somali National Army."), *aff'd,* 811 F.3d 653 (4th Cir. 2016); *id.* ("[P]rohibitions against extrajudicial killing and torture are foundational international norms, meaning that no state . . .

may condone such acts.").  Thus, El Salvador is not the real party in interest and the Motion will be denied in this regard.

  b.  El Salvador Is Not an "Absent Required Party" Warranting Dismissal.

  The Supreme Court has also noted that, in some cases, "[e]ven when a plaintiff names only a foreign official, it may be the case that the foreign state itself, its political subdivision, or an agency or instrumentality is a required party, because that party has 'an interest relating to the subject of the action' and 'disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest.'"  *Samantar*, 560 U.S. at 324 (quoting Fed. R. Civ. P. 19(a)(1)(B)).  "If this is the case, and the entity is immune from suit under the FSIA, the district court may have to dismiss the suit . . . ."  *Id.* at 324-25 (citing *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008) ("[W]here sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign.")).

  In *Pimentel*, the case cited by the Supreme Court, involved an interpleader action to determine the proper ownership of funds that had been misappropriated by the former president of the Republic of the Philippines.  *Pimentel*, 553 U.S. at 858-60.  The Republic of the Philippines, a state-run Philippine Commission, creditors, and human rights victims with a court judgment each laid claim to the funds.  *Id.*  The Republic of the Philippines and the Philippine Commission asserted sovereign immunity under the FSIA and moved to dismiss the suit under Rule 19(b).  *Id.* at 859.  The purpose of an interpleader action "is to resolve in one proceeding all claims to a res." *In re Republic of Philippines*, 309 F.3d 1143, 1153 (9th Cir. 2002), *rev'd on other grounds sub nom. Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008).  Thus, "[w]ithout all significant claimants in an interpleader action, its purpose is materially frustrated."  *Id.*  Accordingly, it was

uncontested that the Republic of the Philippines and the Philippine Commission were required parties. *Pimentel*, 553 U.S. at 863-64.

Here, however, El Salvador is not a required party. Defendant argues that El Salvador has an "interest" in this action because Plaintiff "alleges crimes and a cover-up committed by its government through 'state actors.'" Dkt. 23 at 9-10. However, as discussed *supra*, Plaintiff is suing Defendant in his personal capacity and is seeking damages only from Defendant's own personal resources, and thus whether liability extends to El Salvador itself is not at issue and beyond the scope of Plaintiff's claim. Moreover, if Defendant is found to have committed the *jus cogens* violation alleged, legally this violation is treated as not having been officially authorized by El Salvador. Additionally, this alleged general "interest" is not of the same type as the direct claim over the disputed funds in *Pimentel*, and Plaintiff cites no other cases on this issue. Dkt. 23 at 15-17.

Indeed, the Fourth Circuit has explained that its prior decisions finding a "necessary party" under Rule 19(a) "involve a situation where the contracts or obligations of the 'necessary' party were being interpreted or were otherwise directly at issue." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 951 (4th Cir. 2020) (citing *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 434 (4th Cir. 2014) (determining third parties "actively contesting their liability in state court" under a contract and entitled to insurance by the defendants for construction defects like those alleged had "a natural interest in any adjudication of the terms of [the] contract"); *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 552-53 (4th Cir. 2006) (deeming necessary and indispensable the third party whose preferential hiring policy dictated the defendant casino operator's conduct, where the court would be deciding the legality of the policy); *Nat'l Union Fire Ins. Co. v. Rite Aid of S.C., Inc.*, 210 F.3d 246, 251 (4th Cir. 2000) (indicating that the court's decision would "necessarily

require it to interpret the notice provisions of the policy and other agreements" between the plaintiff and the absent party)). That is not the situation here. Thus, under Fourth Circuit precedent, El Salvador is not a required party here. Accordingly, this action will not be dismissed on that basis.

> ### 2. Defendant Is Not Entitled to Common Law Conduct-Based Immunity.

With regard to Defendant's argument that he is entitled to common-law conduct-based immunity, in *Yousuf*, the Fourth Circuit expressly held that, "under international and domestic law, officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity." *Yousuf*, 699 F.3d at 777; *see also Warfaa*, 811 F.3d at 661-62 (holding in context of TVPA claim that *Yousuf* forecloses a former military official's claim of conduct-based immunity for *jus cogens* violations). As discussed *supra*, the alleged extrajudicial killing in this case qualifies as a violation of *jus cogens*. Accordingly, Defendant is not entitled to conduct-based official immunity under the common law. *Yousuf*, 699 F.3d at 778 ("Because this case involves acts that violated *jus cogens norms,* including torture, extrajudicial killings and prolonged arbitrary imprisonment of politically and ethnically disfavored groups, we conclude that Samantar is not entitled to conduct-based official immunity under the common law, which in this area incorporates international law.").

Defendant attempts to distinguish *Yousuf* by noting that the defendant there was a former official of a state "with no currently recognized government." *Id.* at 767. As the *Yousuf* decision makes apparent, however, the Fourth Circuit's holding was made independently of the State Department's suggestion on non-immunity, which had noted there was no recognized government in Somalia to assert or waive the defendant's immunity at the time of the lawsuit. *Id.* at 778 ("Because this case involves acts that violated *jus cogens* norms, including . . . extrajudicial killings

. . . we conclude that Samantar is not entitled to conduct-based official immunity under the common law, which in this area incorporates international law. *Moreover,* the [State Department's suggestion on non-immunity] has supplied us with *additional reasons to support this conclusion*." (emphases added)). Thus, *Yousuf* governs this case, and Defendant is not entitled to common-law conduct-based official immunity. Accordingly, Defendant's Motion will also be denied in this regard.

### B. Plaintiff's Claim Is Not Barred by the Ten-Year Statute of Limitations.

Defendant further argues that Plaintiff's TVPA claim is barred by the statute of limitations. As a preliminary matter, the Court notes that, as a general rule, "a defense based on the statute of limitations must be raised by the defendant through an affirmative defense." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). A 12(b)(6) motion to dismiss, which tests the sufficiency of the complaint, "generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's complaint is time-barred." *Id.* Indeed, "these defenses are more properly reserved for consideration on a motion for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993). Only in "relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint" may a defendant raise—and the Court consider—a statute of limitations defense at the motion to dismiss stage. *Goodman*, 494 F.3d at 464. When the facts necessary to establish the time bar are not apparent on the face of the complaint, however, the Court should allow the suit to proceed to discovery. *See Cruz v. Maypa*, 773 F.3d 138, 146 (4th Cir. 2014) (reversing the district court's dismissal and remanding for discovery when Plaintiff pleaded facts sufficient to support equitable tolling of the statute of limitations).

In this case, Plaintiff has sued Defendant under the TVPA. Under the TVPA, a plaintiff has ten years from the date a cause of action arises to bring suit for extrajudicial killing or torture. 28 U.S.C. § 1350 note ("No action shall be maintained under this section unless it is commenced within 10 years after the cause of action arose."). The alleged extrajudicial killing giving rise to Plaintiff's claims occurred on March 17, 1982. Dkt. 1 ¶ 1. Plaintiff did not file suit until October 9, 2024. Accordingly, the dispositive question is whether the doctrine of equitable tolling permits Plaintiff's claims to go forward notwithstanding the delay.

Judges in this District and elsewhere have held that equitable tolling is available for TVPA claims. *Warfaa*, 33 F. Supp. 3d at 664 (collecting cases). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). "The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." *Holland v. Florida*, 560 U.S. 631, 653 (2010) (cleaned up). Application of the doctrine to permit an otherwise time-barred case to proceed is appropriate when "extraordinary circumstances beyond [a plaintiff's] control prevented him from complying with the statutory time limit." *Spencer v. Sutton,* 239 F.3d 626, 630 (4th Cir. 2001) (internal quotation marks omitted) (quoting *Harris v. Hutchinson,* 209 F.3d 325, 330 (4th Cir. 2000)).

Here, Plaintiff has alleged that his brother was killed during a civil war that did not end until 1992. Dkt. 1 ¶¶ 1-2. And the Complaint specifically alleges that pervasive violence, repression and threats to investigators, judges, and potential witnesses, and the Salvadoran security forces' cover-up, prevented an effective investigation of human rights abuses committed by Salvadoran security forces during the civil war. Dkt. ¶¶ 2-4, 15-19, 141-144. "There is a consensus

among the federal courts that civil war and a repressive authoritarian regime constitute 'extraordinary circumstances' for purposes of tolling the TVPA's limitations period." *Warfaa*, 33 F. Supp. 3d at 664; *see also Chavez*, 559 F.3d at 493-94 (citing fear of retaliation and absence of an effective justice system in El Salvador as bases for equitable tolling); *Arce*, 434 F.3d at 1262-63 (same). Accordingly, at this stage, Plaintiff has alleged sufficient facts to support the tolling of the statue of limitations at least through the end of the civil war in 1992.

After the civil war, Plaintiff alleges that he continued to be unable to access information to support his claim because the Salvadoran Amnesty Law that was effective from 1993 to 2016 "made domestic investigations and prosecutions for crimes committed in the context of the armed conflict impossible." Dkt. 1 ¶¶ 145-146; *see also id.* ¶ 148 (citing Inter-American Court of Human Rights judgment in *El Mozote v. El Salvador* that held that the Amnesty Law had thus far prevented "the *investigation*, prosecution and, where appropriate, punishment" of those responsible) (emphasis added). And Plaintiff specifically alleges that, "[e]ven with the protection of the Amnesty Law, Salvadoran Security Forces *continued to block access to key evidence . . .* [of] its involvement in human rights abuses during the civil war, including targeted killings carried out by the Security Forces." Dkt. 1 ¶ 146 (emphasis added). The Fourth Circuit has recognized that "regimes committing egregious human rights violations don't ordinarily foster legal systems in which those abuses can be redressed, so permitting tolling until claimants have the ability to both *compile evidence supporting their claims* and pursue claims without fear of reprisal falls within the purpose of equitable tolling specifically and the TVPA more generally." *Warfaa*, 1 F.4th at 295 (emphasis added); *see also Camps v. Bravo*, No. 1:20-CV-24294, 2023 WL 11959805, at *10 (S.D. Fla. June 30, 2023) (noting that continuing impediments to accountability even after the military regime left power, including the enactment of amnesty laws, were factors in warranting

tolling).  Thus, Plaintiff has also alleged sufficient facts at this stage to support the tolling of the statute of limitations from 1993 until 2016.[2]

As to reasonable diligence, Plaintiff alleges that, soon after the 2016 Supreme Court decision invalidating the Amnesty Law, and the Salvadoran Human Rights Unit was created to investigate crimes committed during the civil war, Plaintiff filed a criminal complaint in El Salvador that ultimately led to the indictment of three former military officers, including Defendant.  Dkt. 1 ¶¶ 150-159.  Plaintiff alleges that, although Defendant had regularly traveled to El Salvador prior to his indictment, after the indictment, Defendant "has avoided arrest in El Salvador by no longer returning to El Salvador."  *Id.* ¶ 160.  Plaintiff also alleges that in 2023, INTERPOL issued a Red Notice for Defendant's provisional arrest, but no action has yet been taken, and no information suggests that extradition or deportation will be prompt or even possible.  Dkt. 1 ¶¶ 160-162.  Accordingly, Plaintiff has sufficiently pleaded reasonable diligence at this stage when he filed the instant action in October 2024.

Because the foregoing allegations support the possible tolling of the statute of limitations, the Court therefore finds that the facts on the face of the Amended Complaint do not conclusively establish a time bar such that dismissal at this stage would be warranted.  Accordingly, the Court will deny the Motion to Dismiss on this ground.

---

[2] Plaintiff has further alleged that, even after 2016, "Salvadoran Security Forces continued to block access to evidence and to obstruct any investigations into its abuses during the civil war, even in the face of court orders."  Dkt. 1 ¶ 151.  And Plaintiff alleges that he did not become aware of Defendant's presence in Virginia until September 2018 when a Dutch investigative journalist located Defendant at his current residence.  Dkt. 1 ¶ 154.  Because Plaintiff has alleged sufficient facts to support equitable tolling through 2016 on other grounds, the Court does not reach these additional bases at this stage.

C.  The TVPA Applies Retroactively.

Defendant also argues that the TVPA does not apply retroactively to conduct before its enactment in 1992.  This argument is not well taken, however, as numerous courts faced with this question have found precisely the opposite—including judges in this District.  In *Warfaa v. Ali*, U.S. District Judge Leonie M. Brinkema rejected this argument and held that the TVPA granted jurisdiction for conduct occurring in 1987.  33 F. Supp. 3d at 666 ("Defendant responds that the offending acts are beyond the reach of the TVPA because they were committed before the TVPA was enacted in 1991. This line of argument has been considered and rejected by several courts on the grounds that extrajudicial killing and torture have clearly contravened established international law for decades." (citing *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) (upholding jury verdict in favor of plaintiff who brought TVPA claims based on offending acts which occurred in 1973)).  Indeed, the TVPA has consistently been applied to conduct occurring before 1992.  *See, e.g.*, *Samantar*, 699 F.3d at 766 (extrajudicial killings, torture, and arbitrary detention committed prior to January 1991); *Chavez*, 559 F.3d at 493-94 (extrajudicial killings committed during the El Salvador civil war, between 1980 and 1983); *Arce*, 434 F.3d at 1256 (same, between 1979 and 1983); *Cabello*, 402 F.3d at 1148 (extrajudicial killing committed in 1973); *Hilao*, 103 F.3d at 773 (conduct between 1965 and 1981); *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1195 (S.D.N.Y. 1996) (conduct committed between 1986 and June 1991) ("Under the principles enunciated in *Landgraf*, the retroactive application of the TVPA is entirely proper."); *Bidegain v. Vega*, No. 22-CV-60338-RAR, 2024 WL 3537482, at *8 (S.D. Fla. June 18, 2024) (extrajudicial killing and

torture committed in 1985). This Court declines to depart from this precedent, and Defendant's Motion will be denied on this ground.

### D. Plaintiff Has Sufficiently Alleged Standing.

Defendants also argue that Plaintiff, as decedent's brother, lacks standing to pursue his TVPA claim. The TVPA identifies two categories of plaintiffs for claims based on an extrajudicial killing: (i) "the individual's legal representative," or (ii) "any person who may be a claimant in an action for wrongful death." 28 U.S.C. § 1350, note, § 2(a)(2). The term "legal representative" is limited to "the executor or executrix of the decedent's estate." S. Rep. No. 102-249, at 7. Plaintiff does not allege that he is the executor of his brother's estate. Accordingly, the issue before the Court is whether Plaintiff is a person who may be a claimant in an action for wrongful death.

The TVPA does not identify which persons may be a claimant in an action for wrongful death. Thus, to determine whether a plaintiff would be a proper wrongful death claimant, courts first look to state law to determine whether a plaintiff is a proper wrongful death claimant under the TVPA. *Baloco ex rel. Tapia v. Drummond Co., Inc.*, 640 F.3d 1338, 1349 (11th Cir. 2011). If state law would provide the plaintiff no remedy, then a court may then apply foreign law that would recognize the plaintiff's claim. *Id.* at 1349 & n.12.

The Court therefore must first determine whether Plaintiff is a proper wrongful death claimant under Virginia law. "Although the TVPA instructs courts to look to 'state law' to determine the parties' status as wrongful death claimants, it does not specify whether a court should apply the state's 'whole law,' including its choice-of-law provisions, or only its substantive 'internal law.'" *Id.* at 1349. Although the parties dispute this issue, the Court does not need to

resolve which approach to apply in this case because, ultimately, under either framework, the law of El Salvador ultimately applies.  *See id.*

Assuming Virginia's whole law applies, Virginia follows the *lex loci delicti* rule for its choice-of-law analysis.  *Insteel Indus., Inc. v. Costanza Contracting Co.*, 276 F. Supp. 2d 479, 487 (E.D. Va. 2003) (citing *Jones v. R.S. Jones & Assocs.*, 246 Va. 3, 5 (1993) (explaining that the Court would continue to adhere to the *lex loci delicti*, or place of the wrong, standard that had been "the settled rule in Virginia").  Under this rule, "the law of the place of the wrong determines the substantive issues of tort liability."  *Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993).  The standing provision of Virginia's wrongful death statute has been treated by another court in this District as substantive law.  *See Jones v. Prince George's Cnty., Md.*, 541 F. Supp. 2d 761, 766 n.10 (D. Md. 2008) (analyzing Virginia law on standing and right to recover damages after following *lex loci delicti*), *aff'd,* 355 F. App'x 724 (4th Cir. 2009).  Accordingly, under this interpretation, the law of El Salvador applies.

Similarly, assuming only Virginia's internal law applies, the only person who would be able to file a wrongful death lawsuit on behalf of the decedent is "the personal representative of such deceased person."  Code of Va. § 8.01-50(C).  A "personal representative" under Virginia law does not include a decedent's sibling, unless that sibling is the executor or administrator of the decedent's estate.  *Id.* § 1-234.  Because this would leave Plaintiff without a remedy, the Court then turns again to the law of El Salvador.  *See Baloco*, 640 F.3d at 1349 n.12 ("We reach the same result applying Alabama's substantive law.  First, we would find that the Children are not proper wrongful death complainants under Alabama's internal law.  Thus, the Children would find themselves with 'no remedy whatsoever' under Anglo–American law.  . . . [W]e would then determine whether the Children possessed a remedy under foreign law, which in this case the

parties concede to be that of Colombia."); *see also Cabello*, 157 F. Supp. 2d at 1356-58 (applying Chilean law where Florida wrongful death statute only allowed claims by estate representative and finding that under Chilean law, siblings had standing as wrongful death claimants).  Accordingly, under either analysis, the Court must look to Plaintiff's ability to bring a claim under Salvadoran law.

It is undisputed that Plaintiff has standing in El Salvador to seek compensation for the alleged wrongful death of his brother.  Dkt. 1 ¶¶ 155-56; Dkt. 23 at 30-31; Dkt. 23-3 at 3 (Crim. Code art. 70 (El Sal.), providing that "heirs" of injured parties may bring civil claims within criminal actions); Dkt. 28 at 31; Dkt. 30 at 15.  Accordingly, Plaintiff has sufficiently alleged standing, and the Motion will be denied on this ground.

E.  Defendant's Exhaustion of Remedies Defense Is Not Ripe for Consideration.

Finally, Defendant argues that this Court should dismiss Plaintiff's Complaint because Plaintiff has not exhausted his remedies in El Salvador.  The exhaustion requirement under the TVPA can be satisfied by showing that "foreign remedies are unobtainable, ineffective, inadequate, or obviously futile." *Xuncax*, 886 F. Supp. at 178 (quoting S. Rep. No. 102-249, 10); *see also Jean*, 431 F.3d at 782 (stating a plaintiff can satisfy the exhaustion requirement "by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile").

The TVPA exhaustion requirement "is an affirmative defense, requiring the defendant to bear the burden of proof," a burden which is considered "substantial." *Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005).  And a plaintiff does not need "to plead affirmatively in his complaint matters that might be responsive to affirmative defenses even before the affirmative defenses are raised." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 466 (4th Cir. 2007) (en banc).  As explained

*supra*, only in the "relatively rare circumstances" when "all facts necessary to the affirmative defense clearly appear on the face of the complaint" may an affirmative defense, such as exhaustion, be considered in a motion filed under Rule 12(b)(6). *L.N.P. v. Kijakazi*, 64 F.4th 577, 586 (4th Cir. 2023). Moreover, "to succeed in these rare circumstances, the defendant must show that the plaintiff's potential [response] to the affirmative defense was foreclosed by the allegations in the complaint." *Id.* (brackets in the original).

Additionally, with regard to the TVPA specifically, courts have held that, "[i]n most instances, initiation of litigation under the TVPA 'will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred.'" *Boniface v. Viliena*, 338 F. Supp. 3d 50, 65 (D. Mass 2018) (quoting *Jean*, 431 F.3d at 781-82). To the extent there is any doubt surrounding this issue, "both Congress and international tribunals have mandated that such doubts be resolved in favor of the plaintiffs." *Id.* (citing *Enahoro v. Abubakar*, 408 F.3d 877, 892 (7th Cir. 2005)).

Here, while Defendant argues in his Opposition that he is being tried in *absentia* in El Salvador and that, if one of the criminal defendants in El Salvador is found guilty, Plaintiff would theoretically be subsequently able to seek civil damages from the Salvadoran government there, Dkt. 23 at 32, Defendant has not shown that Plaintiff's potential responses to this affirmative defense—that any potential remedies in El Salvador are, for example, ineffective, unduly prolonged, inadequate, or obviously futile—are foreclosed by the allegations in the Complaint. Considering the stage of the litigation and the guidance from other courts cited above, this Court

finds that deferral of consideration of exhaustion is appropriate at this time. *See Boniface*, 338 F. Supp. 3d at 66 (collecting cases deferring decision on exhaustion to a later stage).[3]

### F.  The Court Declines to Issue a Stay.

Defendant also argues in the alternative that this Court should stay this case pending the outcome of the criminal proceedings in El Salvador.  A party seeking a stay "must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *Williford v. Armstrong World Inds., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983).  A court should consider three factors when considering a stay: "(1) the interests of judicial economy; (2) hardship and equity to the moving party if the action is not stayed; [and,] (3) potential prejudice to the non-moving party."  *Gibbs v. Plain Green, LLC*, 331 F. Supp. 3d 518, 525 (E.D. Va. 2018) (internal citations omitted).

Defendant argues first that "[t]here is no need for this action to be litigated, when Plaintiff may receive the damages he seeks in this action through proceedings in El Salvador, which are already underway," and raises Defendant's age and chronic physical health problems as a reason to avoid a "duplicative effort."  Dkt. 23 at 33.  As addressed above, it is still a live issue in this case whether any potential remedies in El Salvador, including the criminal case, are ineffective, unduly prolonged, inadequate, or obviously futile.  Accordingly, the Court is not persuaded by this argument.

Defendant next argues that he would be prejudiced if this action proceeds because he will be forced to decide whether to invoke his right to remain silent, which may permit an adverse inference and prejudice his defense, or risk any statements made in this lawsuit being used against

---

[3] It appears that, at this stage, Plaintiff has at least plausibly alleged that obtaining relief is "unduly prolonged" where he filed a criminal complaint in 2018. *See Jean*, 431 F.3d at 782.

him in the Salvadoran criminal action.  Dkt. 23 at 33-34.  The Fourth Circuit has held, however, that the Fifth Amendment right to remain silent does not apply when a defendant fears the risk of prosecution by a foreign government.  *Snider v. Seung Lee*, 584 F.3d 193, 201 (4th Cir. 2009) ("In [*United States v. Balsys*, 524 U.S. 666 (1998)]*,* the defendant declined to answer a question about his activities during World War II for fear of prosecution by Lithuania or Israel.  The Supreme Court held "that concern with foreign prosecution is beyond the scope of the Self-incrimination Clause."  *Id.* at 669.  In reaching its holding, the Supreme Court stated that even though the defendant's fear of prosecution by a foreign nation might be reasonable, the criminal prosecution *by a foreign government* was nonetheless not subject to U.S. constitutional guarantees.  *Id.* at 672-74.").  Thus, the Court is also unpersuaded by this argument.

On the other side, the potential prejudice to Plaintiff by a stay of an indefinite length is significant.  *See Simpson v. LLAB Trucking, Inc.*, 2022 WL 2614876, at *3 (E.D. Va. Jan. 26, 2022) ("[T]his court has found potential delays of four to six months to be 'significant' and therefore prejudicial to a non-moving party as well as instances where the expected delay is not entirely concrete.") (collecting cases); *Sehler v. Prospect Mortg., LLC*, 2013 WL 5184216, at *3 (E.D. Va. Sept. 16, 2013) (finding a potential delay of four to six months to be "significant" and therefore prejudicial to the non-moving party).  Indeed, the very things that Defendant points to—his age and health—counsel against staying this case for an indeterminate length of time.

Accordingly, Defendant has not met his burden, and his request for a stay pending resolution of the criminal case in El Salvador will be denied.

*** 

Accordingly, it is hereby ORDERED that Defendant's Motion to Dismiss, or Alternatively, Stay (Dkt. 22) is DENIED; and it is

FURTHER ORDERED that Plaintiff's Motion for Leave to File a Sur-Reply (Dkt. 31) is GRANTED; and it is

FURTHER ORDERED that a scheduling order will issue promptly.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record.

It is SO ORDERED.

Alexandria, Virginia
September 10, 2025

_____ /s/

Rossie D. Alston, Jr.
United States District Judge